# Kline v. Kline

*E. Jay Tract,* for plaintiff.
*Janet Kline,* pro se.

CAMPBELL, *J.,* June 19, 2006—A custody trial was held in the above-captioned matter on June 2, 2006. At issue was primary custody of the parties' minor children Kristopher Kline, born December 7, 1994 and Samantha Kline, born November 2, 2001. The court finds as follows:

## I. FINDINGS OF FACT

(1) Plaintiff, John E. Kline (Father), is an adult residing at 1462 Cedar Top, Reading, Berks County, PA. Father resides in a three bedroom apartment.

(2) Defendant, Janet Kline (Mother), is an adult residing at 32 East Mohn Street, Mohnton, Berks County, PA. Mother resides in her mother's two bedroom house.

(3) Mother and Father live close to one another, less than two miles apart. They both reside in the Governor Mifflin School District.

(4) Mother and Father are the natural parents of two children: Kristoffer Kline, born December 7, 1994, and Samantha Kline, born November 29, 2001.

(5) Mother and Father were married in 1994 and separated in 2004.

(6) Father filed a divorce complaint in December 2004. This divorce complaint contained a custody claim wherein Father petitioned for primary custody of the children.

(7) On April 25, 2005, after a hearing, a protection from abuse order was entered against Father by the court on behalf of Mother as a protected person. This protection from abuse order contained a custody provision that awarded primary physical custody of the parties' two children to Mother. Father was awarded partial physical custody of the children on alternate weekends from 12 p.m. Saturday until 6 p.m. Sunday, and each Wednesday from 5:30 p.m. until 8:30 p.m.

(8) The parties participated in a custody evaluation by Andrea W. Sledge M.S.W.

(9) The parties participated in a custody hearing on July 15, 2005. The custody master issued a recommended order August 10, 2005.

(10) Mother filed timely exceptions to the master's recommended order.

(11) This current custody trial is a trial de novo in response to the exceptions filed by Mother to the custody master's recommended order of August 10, 2005.

(12) Father graduated from high school.

(13) Father is employed as a painter at Reading Truck Body in Reading. He earns approximately $38,000 a year.

(14) Father works Monday through Thursday from 7 a.m. until 5 p.m.

(15) Mother obtained a G.E.D. and has taken additional college classes. She is currently continuing her higher education at Reading Area Community College (R.A.C.C.).

(16) Mother works part-time at R.A.C.C. and also works part-time at C.P.I. Inc. (Sears Portrait Studio).

Mother's current annual income is unclear. It appears to be in the low range, between $3,500 to $15,000 annually.

(17) Mother's work hours vary. This school term she was working day shifts at R.A.C.C. between 9 a.m. and 4 p.m. She also attends classes. This term she was attending classes on Monday and Wednesday nights.

(18) Kristoffer Kline, age 11, attends fifth grade at Governor Mifflin Intermediate School.

(19) Samantha Kline, age 4, has been attending preschool at the Reading Area Community College Day Care Center.

(20) The two children also have regular babysitters while Mother is at work.

## II. DISCUSSION

Father and Mother both seek primary physical custody. Mother has had primary physical custody by way of the protection from abuse order. Father's partial custody has only been one overnight every other weekend, and three hours every Wednesday evening. This court considered the testimony of Father—John E. Kline, Mother—Janet Kline, custody evaluator—Andrea Sledge, mother of Ms. Kline—Ms. Michelle Davis, sister of Father—Kristen Kline, sister of Father—Karen Kline, previous neighbor and acquaintance of the two parties—Carol Knepp.

A court's custody decision "is a determination of what is in the best interests of the child. Such a determination, made on a case-by-case basis, must be premised upon consideration of 'all factors which legitimately have an

effect upon the child's physical, intellectual, moral and spiritual well-being.' " *Alfred v. Braxton,* 442 Pa. Super. 381, 385, 659 A.2d 1040, 1042 (1995), quoting *Lee v. Fontine,* 406 Pa. Super. 487, 488, 594 A.2d 724, 725 (1991). The best interests of a child are "paramount." *Costello v. Costello,* 446 Pa. Super. 371, 375, 666 A.2d 1096, 1098 (1995).

While this court will carefully consider Father's request for primary custody, courts are reluctant to disturb existing custody arrangements which have satisfactorily served the best interests of the child. *Wiseman v. Wahl,* 718 A.2d 844, 846 (Pa. Super. 1998). In this case, no written custody agreement or order appears in the record until the protection from abuse order. However, Mother was the primary caregiver during the marriage and after the separation in 2004. The court entered the April 25, 2006 protection from abuse order with the custody provision formalizing Mother's primary physical custody until the custody case could be resolved.

These children appear to be thriving. Both children appear healthy. Kristoffer is an honors student and excels in an extracurricular activity. Samantha is cheerful and outgoing. When they testified, the children appeared to love both parents. They did not express any desire to have custody time shifted from Mother to Father. If anything, their testimony showed they are more psychologically and emotionally connected to their Mother.

As the children are currently doing well, this court needed a convincing rationale as to why changing primary custody would be in their best interest. Father argued that he was a better parent. Father's main evidence

to support his request for a change is the custody evaluator's opinion. This court was extremely interested in what the evaluator had to report and studied the evaluator's report and testimony carefully. The evaluator was extremely positive about Father, and extremely negative about Mother.

## A. *Regarding the Custody Evaluation*

The evaluator portrayed Father as pro-active, patient, caring and responsible. The evaluator portrayed Mother as angry, manipulative, self-centered and fraudulent. If this court had seen evidence at trial to support the evaluator's conclusions, this custody decision would have been straightforward. But that evidence was simply not there. This court is at a loss to reconcile the evaluator's portrayals of the parents with the evidence in the record and with the evidence that came out at trial.

A trial court cannot "discount" an expert evaluation unless there is competent evidence to support doing so. *King v. King,* 889 A.2d 630, 632 (Pa. Super. 2005), quoting *Nomland v. Nomland,* 813 A.2d 850, 854 (Pa. Super. 2002).

There is a mistake in the first substantive section of the evaluator's April 22, 2005 report. The report reads "Mr. Hess' affect was reserved and anxious." There was no "Mr. Hess" in this case. Again, in the report's "Summary and recommendations" section "Mr. Hess" is mentioned; "Mr. Hess does not appear to have an anger management problem and in fact, exhibits quite the opposite behavior." Putting the wrong name into a "psychodiagnostic interpretation" and again into "Summary and recommendations" is more than a typographical error. It

raises questions of how accurately the report was crafted to describe Mr. Kline.

Then, there are the false substantive statements in the report regarding Mr. Kline. For instance, the evaluator reported that Father "has become more active in church" and "accompanies his son to church on Sundays" and "attends a Protestant United Church of Christ." At trial, it was revealed that while Father has dropped his son off at Sunday school, Father never enters the church. The evaluator appears to have received false information from Father that misled the evaluator. (When Father testified at trial, this court also thought he had been attending church; later testimony by others demonstrated this was not true. Father lied by omission.)

There are other problems in the evaluator's report. The report states that Father "has never had a drug or alcohol problem . . . ." Yet, at trial, Father admitted he had drunk alcohol to excess as a teenager, perhaps as young as 15 years of age. Father appears to have successfully painted an overly positive picture of himself through the evaluation. A large part of the custody evaluation report discusses the protection from abuse order that protects Mother from Father. The evaluator completely embraced Father's version of events as the truth. The evaluator concluded that Mother's protection from abuse order was "fraudulent." The evaluator based her conclusion that Mother is manipulative upon Mother's seeking a fraudulent protection from abuse order. This court granted the protection from abuse order after a hearing and testimony, and this court found that Father abused Mother within the meaning of the Protection from Abuse Act.

This court can understand how the evaluator had conflict with Mother. Mother argued with the evaluator during the first evaluation and did not cooperate with the follow up evaluation. During the trial, Mother often presented as abrasive. Nonetheless, this court has serious doubts about the evidence the evaluator based her report and recommendations upon.

### B. *Suitability of Father To Be Primary Caretaker of the Children*

Father has stable employment and lives in a suitable family home. He obviously loves his children, and they love him. But this court has some serious concerns about Father's judgment as a parent. When this court looked beyond the good attributes claimed by Father, it was left with a series of incidents where Father exercised poor parental judgment. When his son was beaten unconscious and taken to the hospital, Father left the hospital before the results of his son's CAT scan came back. Father claimed he stayed until the results came back, but this court found the testimony of Mother and the grandmother more credible. Father also never found out what happened to the child who injured his son because Father dropped his inquiries when the school did not comply with his requests.

Father was proud of the time when he helped his son with an overdue school project. Father learned of the report when a teacher called him. Father helped his son produce a written report on volcanoes. Father is to be commended for helping his son. On the other hand, despite the fact that Father knew the project included a second portion where a model volcano had to be built,

Father did nothing to follow up and finish the project with his son. Father blamed Mother for not informing him as to the project's exact due date. Father offered no testimony that he asked his son, the custody intermediary, or the teacher about the second stage of the project. His son, Kristoffer, was disappointed that his Father did not complete the project with him. This incident was minor, but demonstrated a lack of follow through on Father's part. Likewise, Father admitted he had an internet link where he could follow his son's karate competitions, but after using the link once, Father forgot about it.

There was testimony that Father did not apply sunscreen to his daughter, and Samantha received a sunburn at a ball game. The two parents disagree about the severity of this sunburn. This court considers this event a minor lapse in judgment on Father's part.

More seriously, on another occasion, Samantha fell down on the concrete outside Father's front door and was injured. She had a facial injury and was bleeding copiously. Father saw that his young daughter was seriously hurt and believed she needed to go to the hospital. He put her in his car and drove her the few minutes drive to Mother's home and dropped her off with the suggestion that she be taken to the hospital. Father did not take his daughter to the hospital because he testified he was afraid Mother would have him arrested for exceeding his custody time prescribed in the protection from abuse order. This hospital decision is questionable but understandable. However, Father did not grab a bandage, a towel, or take the shirt off his back and try to immediately stem the young girl's bleeding. He did not apply ice or medicine. These would be obvious responses when a young child is bleeding copiously from a wound. Father

could have risked being a few minutes late, or applied a wet towel to his daughter's wound and called the custody intermediary to explain. This accident response was simply bad judgment on his part.

These incidents cause the court to doubt Father's ability to step successfully into the primary caretaker role. This court's only concern is the best interest of the children. Father blames Mother for not allowing him to do more with the children, but a primary caretaker must be pro-active to safeguard the children's safety and best interests.

By law, Father's history of domestic violence is a custody consideration. 23 Pa. §5303(a)(3). Father was never violent against the children, but a protection from abuse order was entered against him because of abuse against Mother. This court does not have any concerns about his being safe around the children, but his past violence shows more poor judgment on his part.

In general, this court was not impressed with Father's credibility. Some information he provided in his questionnaire was inaccurate; for instance, he listed no mental health issues, diagnoses, or treatments in his past, yet he reported to the custody evaluator that he had been prescribed antidepressant medicines for social anxiety disorder. At trial, his testimony regarding religion was misleading. His answers throughout the trial did not convince this court he was always telling the truth. For instance, based upon the other witnesses' testimony, this court did not believe Father's testimony that his son did not bring him report cards. Therefore, when Father defended his having written a letter confessing rape by stating that he only wrote this letter because Mother told

him to, this court was not impressed. Either Father was telling the truth, and he practiced incredibly poor judgment by admitting to a serious crime that he did not commit, or he was lying and he did commit this crime.

Neither the custody evaluator's report nor her testimony addressed the incidents that cause this court to doubt that Father's parental judgment is currently sound enough to be the children's primary caretaker. Therefore, this court is discounting the evaluator's glowing recommendation of Father, and forming its own opinion based upon all the evidence in the record. This court's impression of Father is that he loves his children and is generally a capable parent, but he has demonstrated poor judgment in key situations in the past. Father has not accepted responsibility for these mistakes. As the children's welfare is this court's only concern, this court is concerned that if the children spend the majority of their time with Father, Father's poor judgment could lead to the children's detriment.

## C. *Suitability of Mother To Be Primary Caretaker of the Children*

As discussed above, the evaluator gave an extremely negative report of Mother. The evaluator's opinion was largely based upon information from Father. The evaluator's opinion regarding the protection from abuse order runs counter to this court's abuse finding. Much of the evaluator's negative opinion of Mother is based upon the evaluator's opinion that the abuse was fraudulent. There is no doubt that Mother was defensive and non-cooperative with the evaluator. Mother is not perfect. At trial

she presented as abrasive. Yet, she also appeared intelligent, capable, and loving of her children. The only substantiated failing of Mother is that she is not a good housekeeper. Clutter is not an ideal environment for children, but it is not a serious detriment. This court is not convinced that Mother's poor housekeeping has led to anything more serious than clutter.

When Mother and children lived at her prior home, the home environment may have posed some dangers to the children because of holes in the walls. It appeared at trial that Mother and Father were equally responsible for these dangers. As Mother and the children no longer live at this home, the point is moot.

While Father made accusations about the grandmother's house where Mother lives now, the evidence was not strong enough to establish an unsafe environment. This court was glad to learn that a cooling device has been placed in the attic where Kristoffer sleeps, and this court suggests that the temperature be carefully monitored to see if additional action is necessary. There is no doubt that Father's current home is superior. But Mother has only been in grandmother's home for a short time. Father has only been in his apartment for a short time as well. It is difficult to know what the future will bring.

As to the strengths of Mother, she regularly helps Kristoffer with his homework, is involved with school, has supported extracurricular activities for both children and generally takes good care of the children. The strongest evidence in Mother's factor is that the children are doing well. Samantha smiled more than any previous child in this court's history during her in camera inter-

view. Kristoffer likes school, is achieving good grades, and he is enjoying and excelling at karate.

## III. CONCLUSION

Mother has flaws. Father has flaws. Both parents entered the trial focusing on the other's flaws. Father failed to prove that Mother has more serious parenting flaws than he does. Father failed to prove he has more parenting strengths than Mother. Indeed, based upon all the evidence, this court concludes that Mother currently has stronger parenting skills. Mother having primary custody is working best for the children.

There is a protection from abuse order protecting the Mother from Father, so they may not have direct contact. The grandmother, Mother's mother, has performed admirably as a custody intermediary. At the custody trial, Father's sister was added as an alternate custody intermediary. There is no evidence that one parent or the other would be better at encouraging contact with the other.

Based upon the evidence presented in this case, this court will order that Mother have primary custody. However, the children love their father, and he loves them. Despite his poor judgment on certain occasions, Father appears capable of adequately supervising the children during partial custody. The children should get to spend more time with their Father. Therefore, Father's partial physical custody time shall be increased.

As noted above, there is a protection from abuse order between these two parties (against Father on behalf of Mother). The custody provisions in that protection from

abuse order shall be amended to mirror the custody provisions in this custody order.

For all the foregoing reasons, this court enters the following order:

## ORDER

And now, June 19, 2006, following a custody trial on June 2, 2006 in the above matter, it is hereby ordered and decreed that:

(1) Plaintiff John E. Kline (Father) and defendant, Janet Kline (Mother) shall have joint legal custody of their minor children Kristoffer Kline, born December 7, 1994, and Samantha Kline, born November 29, 2001.

(2) The parties shall share physical custody of the children as follows:

(a) Mother shall have primary physical custody.

(b) Father shall have partial custody every Tuesday and Thursday from after work (between 5-6 p.m.) when Father shall pick up the children until 7:30 p.m. Father shall remain by his car at pick up. Mother shall remain by her door. Mother shall pick up the children at Father's residence at 7:30 p.m. Mother shall remain at her car. Father shall remain by his door. There is to be no contact between the parents. (This "no contact" provision between parents shall remain in place as long as there is an active protection from abuse order between the parties.) The one exception to this "no contact" rule is that the parents may exchange, through the children, a custody notebook when there is important custody information to convey to the other parent. All entries in the custody

notebook should directly pertain to the children and be written in a civil manner.

(c) Father shall have custody of the children every other weekend. Father's weekend custody time shall be from 6 p.m. Friday to 6 p.m. Sunday.

(d) Summer schedule.

(i) During the public school's summer vacation period, if Father does not have to work on Friday, then Father may pick up the children at 10 a.m. for his weekend custody period.

(ii) On his non-weekend week during the summer, Father shall have an additional overnight of custody on Thursday. Instead of returning the children on Thursday, he may retain custody until 4 p.m. Friday.

(3) The parties shall alternate custody of the children on the following holidays: New Year's Day, Easter, Memorial Day, July 4, Labor Day, and Thanksgiving. Mother shall have custody New Year's Day, Memorial Day and Labor Day in even-numbered years. Father shall have custody Easter, July 4, and Thanksgiving in even-numbered years. In odd years, Father shall have custody New Year's Day, Memorial Day and Labor Day. In odd years, Mother shall have custody Easter, July 4, and Thanksgiving. Holiday custody shall be from 10 a.m. until 7:30 p.m.

(4) Mother shall have custody of the children on Mother's Day and Father shall have custody on Father's Day. Mother's/Father's Day custody shall be from 10 a.m. until 7:30 p.m.

(5) The Christmas holiday shall be shared as follows: In even-numbered years, Mother shall have custody from

5 p.m. Christmas Eve until 1 p.m. Christmas Day, and Father shall have custody from 1 p.m. Christmas Day until 8 p.m. December 26. The parents shall alternate the schedule in odd-numbered years.

(6) Each parent shall have the right to two non-consecutive weeks of physical custody of the children for vacation. In 2006, each party shall give the other party 30 days advanced written notice of the dates on which that party intends to exercise his or her vacation period. Starting in 2007, each party shall give the other party 60 days of advanced written notice of the dates on which that party intends to exercise his or her vacation period. Parties should endeavor to give as much notice as possible. Each party's week of vacation shall coincide with that party's weekend of custody. If one party reserves a date, and the other party does not object within 30 days, then the first party is entitled to that week of vacation. Otherwise, in the event of a conflict of dates, Mother's choice of dates has priority in even-numbered years, and Father's choice of dates has priority in odd-numbered years.

(7) Unless specifically addressed in this order, the parents shall share transportation equally by the receiving party providing transportation. The parent receiving custody is responsible for picking up the children. (Again, as long as a protection from abuse order is in effect, each parent releasing custody shall remain at his or her door, while the party receiving custody shall remain at his or her car.)

(8) There shall be a status conference in this case on September 12, 2006 at 10:15 a.m.

(9) The attached appendix shall be made a part of the within order.

---

## APPENDIX TO ORDER

Certain rules of conduct which generally apply to custody matters are set forth below and are binding on both parties, the breach of which could become the subject of contempt proceedings before this court, or could constitute grounds for modification of this order. If these general rules conflict with any specific provisions of the order, the order shall prevail.

(1) In addition to the foregoing rights, both parties shall also have the following rights with respect to the children:

(A) The right to reasonable telephone contact with the children when they are in the other parent's custody.

(B) The right to be fully informed concerning the progress of the children in school and the children's medical status, including the right to obtain the necessary information directly from the children's school or medical practitioner; and

(C) The right to be informed in advance before any important decisions are made concerning the child and the opportunity to participate in those decisions.

(2) In the event of any serious illness of the children at any time, any party then having custody of the child shall immediately communicate with the other party by telephone or by any other means, informing the other party as to the nature of such illness, and during such illness, each party shall have the right to visit the child

as he or she desires consistent with the proper medical care of the child.

(3) Neither party shall alienate nor permit or attempt to alienate the child from the other party. While in the presence of the child, neither parent shall make any remarks or do anything which is derogatory or uncomplimentary to the other and it shall be the duty of each parent to uphold the other parent as one the child should respect and love.

(4) Both parties shall provide each other with their addresses and telephone numbers of their residences and anytime they take a trip with the children out of the jurisdiction of Berks County in excess of three days.

(5) The parties shall not conduct arguments or heated conversation when they are together in the presence of their children.

(6) The parties shall at all times consider the children's best interests, and act accordingly. It is in a child's best interests to understand that he or she is trying to desperately cope with the fact of his parents' separation, and needs help in loving both parents, rather than interference or censure.

(7) Neither party shall question the children as to the personal lives of the other parent except insofar as necessary to insure the personal safety of the children. By this we mean that the children will not be used as spies on the other party. It is harmful to a child to be put in the role of spy.

(8) The parties should remember that they cannot teach their children proper moral conduct by indulging in improper conduct themselves. Children are quick to recog-

nize hypocrisy, and the parent who maintains a double standard will lose the respect of his or her child.

(9) Weekend and evening visitation shall be subject to:

(A) Arrangements will be worked out beforehand between the parties without forcing the children to make choices and run the risk of parental displeasure. However, the children shall be consulted as to their schedules when appropriate.

(B) Visitation rights should be exercised at reasonable hours and under circumstances reasonably acceptable to the other party and to the need and desires of the minor children.

(C) If a party finds him or herself unable to keep an appointment, he or she should give immediate notice to the other party, so as to avoid subjecting the children to unnecessary apprehension and failure of expectations.

(D) The party having custody of the children should prepare them both physically and mentally for the transfer of custody to the other party and have them available at the time and place mutually agreed upon.

(E) If either party or a child has plans which conflict with a scheduled visit and wish to change such visitation, the parties should make arrangements for an adjustment acceptable to the schedules of everyone involved. Predetermined schedules are not written in stone, and both parties should be flexible for the sake of the children.

(F) If a party shows up for a visit under the influence of alcohol or drugs, the visit may be considered forfeited on those grounds alone.

(10) If either party feels the other party has violated this order, they may petition the court as set forth in Pa.R.C.P. 1915.12.

---

## MODIFIED FINAL ORDER OF COURT

Defendant's name: John Kline

Defendant's date of birth: January 6, 1974

Defendant's social security number: ***-**-****

Names and dates of birth of all protected persons, including plaintiff and minor children:

    Names        Dates of birth

    1. Janet Kline    January 25, 1975

Plaintiff or protected person(s) is/are:

[X] spouse or former spouse of defendant

[ ] parent of a common child with defendant

[X] current or former sexual or intimate partner with defendant

[ ] child of plaintiff

[ ] child of defendant

[ ] family member related by blood (consanguinity) to defendant

[ ] family member related by marriage or affinity to defendant

[ ] sibling (person who shares biological parenthood) of defendant

[X] current or former cohabitant (person who lives with) defendant.

Defendant was served in accordance with Pa.R.C.P. 1930.4 and provided notice of the time, date and location of the hearing scheduled in this matter.

Appearances by parties and/or counsel:

• Plaintiff appeared personally and is unrepresented.

• Defendant appeared personally and is represented by: E. Jay Tract, Esquire.

And now, June 19, 2006, the court having jurisdiction over the parties and the subject matter, it is ordered, adjudged and decreed as follows:

This order is entered by the court with agreement of the parties in accordance with the custody order.

The modified final order dated June 15, 2006 is modified such that this P.F.A. order's custody provisions mirror the June 19, 2006 custody order. Additionally, defendant is allowed to exchange a custody log, indirectly, with plaintiff.

Plaintiff's request for a modified final protection order is granted.

(1) Defendant shall not abuse, stalk, harass, threaten or attempt to use physical force that would reasonably be expected to cause bodily injury to plaintiff or any other protected person in any place where they might be found.

(2) Defendant is completely evicted and excluded from the residence at: 37 East Summit Street, Mohnton, PA 19540; or any other residence where plaintiff or any

other person protected under this order may live. Exclusive possession of the residence is granted to plaintiff. Defendant shall have no right or privilege to enter or be present on the premises of plaintiff or any other person protected under this order.

(3) Except as provided in paragraph five of this order, defendant is prohibited from having *any contact* with plaintiff either directly or indirectly, or any other person protected under this order, at any location, including but not limited to any contact at plaintiff's or other protected party's school, business, or place of employment. Defendant is specifically ordered to stay away from the following locations for the duration of this order.

Sears Portrait Studio

Reading Area Community College

(4) Except as provided in paragraph five of this order, defendant shall not contact plaintiff, or any other person protected under this order, by telephone or by any other means, including through third persons.

(5) Custody of the following minor children:

(1) Samantha Kline

(2) Kristoffer Kline

shall be as follows:

• Primary physical custody of the minor child/ren is awarded to plaintiff.

• Defendant shall have the following partial physical custody/visitation rights: Defendant shall have partial custody as ordered in the June 19, 2006 custody order.

• Plaintiff's mother, Michale Davis, or sister, Mabel Davis, and defendant's sister, Kristen Kline shall act as third party intermediaries for custody purposes. Defendant may contact either Ms. Davis or Ms. Kristen Kline with regard to custody issues. Defendant may not contact plaintiff with regard to custody issues, except by indirectly exchanging a custody log.

This order supersedes any prior order relating to custody.

6. Any firearm delivered to the sheriff or transferred to a licensed firearm dealer, or a qualified third party who satisfies the procedural and substantive requirements to obtain a safekeeping permit issued under 23 Pa.C.S. §6108.3 pursuant to this order or the temporary order shall not be returned to defendant until further order of court.

7. (a) The costs of this action are imposed on defendant, as follows:

The costs of the action are payable as follows:

Defendant shall pay:

$87.50 by June 25, 2005 to the prothonotary's office.

$44 by June 25, 2005 to the sheriff's office.

Defendant shall pay a surcharge of $25 by June 25, 2005 to the prothonotary's office.

Until the costs are paid in full, the party/parties responsible to pay shall immediately report any change of address in person or in writing to: Prothonotary's Office (2nd Floor) Berks County Courthouse, 6th & Court Streets, Reading, PA 19601.

(8) A certified copy of this order shall be provided to the police department where plaintiff resides and any other agency specified hereafter:

Mohnton Police Department

(9) This order supersedes any prior protection from abuse order.

(10) All provisions of this order shall expire on: October 25, 2006.

## NOTICE TO THE DEFENDANT

Violation of this order may result in your arrest on the charge of indirect criminal contempt which is punishable by a fine of up to $1,000 and/or a jail sentence of up to six months. 23 Pa.C.S. §6114. Violation may also subject you to prosecution and criminal penalties under the Pennsylvania Crimes Code. A violation of this order may result in the revocation of the safekeeping permit, which will require the immediate relinquishment of your firearms, other weapons and ammunition to the sheriff.

This order is enforceable in all 50 states, the District of Columbia, tribal lands, U.S. territories and the Commonwealth of Puerto Rico under the Violence Against Women Act, 18 U.S.C. §2265. If you travel outside of the state and intentionally violate this order, you may be subject to federal criminal proceedings under that Act. 18 U.S.C. §§2261-2262. If you possess a firearm or any ammunition while this order is in effect, you may be charged with a federal offense even if this Pennsylvania order does not expressly prohibit you from possessing firearms or ammunition. 18 U.S.C. §922(g)(8).

## NOTICE TO SHERIFF, POLICE AND LAW ENFORCEMENT OFFICIALS

The police and sheriff who have jurisdiction over plaintiff's residence or any location where a violation of this order occurs or where defendant may be located, shall enforce this order. The court shall have jurisdiction over any indirect criminal contempt proceeding, either in the county where the violation occurred or where this protective order was entered. An arrest for violation of paragraphs 1 through 7 of this order may be without warrant, based solely on probable cause, whether or not the violation is committed in the presence of the police or any sheriff. 23 Pa.C.S. §6113.

Subsequent to an arrest, and without the necessity of a warrant, the police officer or sheriff shall seize all firearms, other weapons and ammunition in defendant's possession that were used or threatened to be used during the violation of the protection order or during prior incidents of abuse.

The Berks County Sheriff's Office shall maintain possession of the firearms, other weapons or ammunition until further order of this court.

When defendant is placed under arrest for violation of this order, defendant shall be taken to the appropriate authority or authorities before whom defendant is to be arraigned. A "complaint for indirect criminal contempt" shall then be completed and signed by the police officer, sheriff or plaintiff. Plaintiff's presence and signature are not required to file the complaint.

If sufficient grounds for violation of this order are alleged, defendant shall be arraigned, bond set, if appropriate and both parties given notice of the date of the hearing.