J-A11012-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| K.M. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| C.L. | : | No. 1358 MDA 2017 |

Appeal from the Order Entered August 4, 2017
In the Court of Common Pleas of York County
Civil Division at No: 2016-FC-214-03

BEFORE: STABILE, J., NICHOLS, J., and PLATT, J.[*]

MEMORANDUM BY STABILE, J.:                    **FILED JULY 02, 2018**

Appellant, K.M. ("Mother"), files this appeal from the order dated August 3, 2017, and entered August 4, 2017,[1] in the York County Court of Common Pleas, awarding Mother and C.L. ("Father") shared legal custody, and awarding Father primary physical custody and Mother partial physical custody

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] The subject order was dated August 3, 2017. However, the clerk did not provide notice pursuant to Pa.R.C.P. 236(b) until August 4, 2017. Our appellate rules designate the date of entry of an order as "the day on which the clerk makes the notation in the docket that notice of entry of the order has been given as required by Pa.R.C.P. 236(b)." Pa.R.A.P. 108(b). Further, our Supreme Court has held that "an order is not appealable until it is entered on the docket with the required notation that appropriate notice has been given." **_Frazier v. City of Philadelphia_**, 735 A.2d 113, 115 (Pa. 1999).

of their minor daughter, P.L., born in August 2011 ("Child"). After careful review, we affirm the trial court's order.

The record reveals the following relevant factual and procedural history:

The parents were married and resided primarily in North Carolina. Father serves in the United States Army and had several deployments. Mother alleges that Father was abusive to her during their marriage. While Father was deployed, Mother began a relationship. She initially lied to Father about the relationship, notable only because it began Father's trust issues with Mother. The parties separated, and Mother moved with the [c]hild, with Father's consent, to York County, Pennsylvania, where the maternal grandparents reside. Father began a relationship in North Carolina with [A.B.L.], now "Step[]mother." Mother began a relationship in Pennsylvania with [S.S.], now "Mother's fiancé."

For a brief period of time, the parties were able to cooperate with regard to custody without a court order. The child was primarily residing with Mother in York County, and Father had extended periods of partial custody. Mother then had criminal difficulties in both Pennsylvania and Maryland. The Pennsylvania charges indirectly resulted in the first round of litigation initiated by Mother when Father withheld custody. The second round of litigation, currently at issue here, was started by Father when he learned additional details about the Pennsylvania incident and learned that Mother was to be incarcerated for 30 days in Maryland for the Maryland charges.

In Pennsylvania, Mother was charged with Endangering the Welfare of a Minor, specifically the child at issue. Mother testified that she called and told Father about the charge. However, it is clear that Mother lied to Father and everyone else about the specifics of the incident, which occurred on November 11, 2014. According to Dr. Yambor, who completed a § 5329 Evaluation of Mother, Mother's story was that she left the child for only ten minutes while she stopped briefly to see a friend who was just out of the military. The police officer testified that the child was alone in the car long enough for a neighbor to notice the child crying and to call 911. The police then took 16 minutes to respond, plus time to search for the mother. Additionally, the police officer testified that the temperature was in the twenties, that [] Child

- 2 -

had no blanket, that Mother came out of a house where drugs were found, and that Mother texted her friend from her phone to lie about how long she had been away. Maternal [G]randmother, with whom Mother resides, even at trial, did not know about the drugs or the details of the incident. Mother eventually pleaded guilty to this offense (enumerated in 23 Pa.C.S.[A.] § 5329) on June 15, 2015.

In December 2015, by agreement of the parties, [] Child went to spend time with Father. Around this time, Father was in the process of relocating from North Carolina to Hawaii with Step[]mother. Father then learned that Mother had pleaded guilty to the "Endangering" charge from a friend. Therefore, he kept the child in Hawaii without Mother's consent beginning in December 2015. This decision resulted in a period of simultaneous proceedings in Pennsylvania and Hawaii. The Hawaii proceedings are not part of the record. A proceeding was held on March 11, 2016, with participation by phone of the judge and counsel in Hawaii. This court (The Honorable Gregory M. Snyder) determined that Pennsylvania was the best jurisdiction to proceed for two main reasons: Father had better financial resources, and the information regarding Mother's threat of harm would be found here. A second Order was entered providing the parties with shared legal custody on March 28, 2016. In this dictated Order, the court notes that Mother is present and states a definition of legal custody. Physical custody is not addressed, most likely due to Mother's guilty plea to an enumerated offense under 23 Pa.C.S.[A.] § 5329.

The first round of litigation was resolved by a Stipulated Order for Custody filed on May 17, 2016 (signed by the Honorable Andrea Marceca Strong), based in part on Mother's successful completion of two § 5329 evaluations. Unknown at the time was that Mother had made substantial misrepresentations and omissions when relaying the November 2014 incident to the evaluators. According to Dr. Yambor, Mother's threat assessment was in part based on Mother's story about the November 2014 incident rather than the facts as described by the police officer. Pursuant to this Order, Mother was awarded primary physical custody of [] Child for the school year, and Father was awarded physical custody for the summer. The Order provided for the return of [] Child to Mother on May 27, 2016, noting that Father had retained custody since December. Mother withdrew a contempt allegation as part of this stipulation.

- 3 -

[] Child then began attending kindergarten at Shrewsbury Christian Academy. Mother somehow avoided a criminal background check for parents and began volunteering at the school. She "poisoned the well" for Father by leading school officials to believe that Father had absconded with [] Child without just cause in the past and indicating that he should not be allowed to pick up the child without her consent. She failed to list Father as an emergency contact as required by the May 17, 2017 Order. When Father came to pick up his daughter at the school, Mother was outside the school with a video camera, which resulted in police involvement. Father then displayed anger management issues in his dealings with school officials.

Mother was also not forthcoming to Father regarding her Maryland criminal difficulties and incarceration. These difficulties stemmed from Mother's completion of a marriage license application on which she apparently did not use her correct legal name or correct age. She also reported her marital status as single while still married to Father. Mother pleaded guilty to one count of perjury in the Circuit Court for Harford County in Maryland on December 14, 2016. She received a sentence of three (3) years imprisonment, with two (2) years and eleven (11) months of a suspended term, and one (1) day credit for time served. Mother testified and her counsel indicated that Mother was granted "probation before judgment" ("PBJ"), for this sentence, whereby once probation had been completed, Mother would be able to have the perjury charge expunged. Originally, Mother was to serve the remaining thirty (30) days imprisonment every Monday and Tuesday for fifteen (15) weeks, beginning on January 9, 2017 at the Harford County Detention Center in Bel Air, Maryland. However, Mother requested, and was granted, the ability to serve the sentence consecutively. She was to begin serve her thirty (30) day incarceration on January 9, 2017.

At that point, this second round of litigation began when Father filed a Petition for Modification on December 21, 2016. He also filed a Petition for Contempt and Special Relief, asking for custody during Mother's period of incarceration. Father alleged that Mother violated the Mutual Consultation clause of that Order by failing to notify him regarding the terms of her incarceration. Father also alleged that Mother failed to notify him that [] Child would be in the care of the maternal grandparents. Father indicated that he found out about Mother's period of imprisonment

from a witness advocate and not from Mother. A Conciliation Scheduling Order was entered on December 21, 2016, whereby a Conciliation Conference was scheduled for January 12, 2017. The Conciliation Conference was re-scheduled for February 6, 2017.

On January 22, 2017, during her period of incarceration, Mother entered into a Guardianship of Minor Agreement with her parents, the [c]hild's maternal grandparents, whereby the maternal grandparents would act as standby guardians to [] Child during Mother's period of incarceration. This agreement did not include Father and was not shared with him. Father's Petition for Special Relief was presented to the court the next day on January 23, 2017. The [c]ourt (The Honorable N. Christopher Menges) denied Father's request for custody because moving [] Child to Hawaii for a month would have required a disruption in kindergarten.

. . .

Mother currently resides at her parents' house in Fawn Grove, Pennsylvania, with her parents, [S.S.] (fiancé), [] Child, and another minor child. [] Child has her own room but rarely sleeps there. She instead sleeps in the basement where Mother stays. Throughout the litigation, Mother has had various jobs as a waitress and bartender, with some periods of unemployment. Her work hours have varied.

Father has served throughout the litigation in the United States Army. He has been stationed both in North Carolina, and he has had periods of deployment. He is currently stationed at Fort Shaffer in Wahiawa, Hawaii, where he is a barracks manager with the rank of sergeant. He resides there with his wife, [A.B.L.]. [] Child has her own room. Father's normal work hours begin Monday through Friday at 9:00 a.m. His work day is typically only two (2) hours long ending at 11:00 a.m., but he may work as late as 3:00 p.m.

. . .

Opinion, 9/5/17, at 2-8 (citations to record omitted).

The court conducted a custody hearing on June 1, 2017, June 2, 2017, and July 20, 2017. Over the course of the hearing, the court heard from Detective Richard Blais, Southern Regional Police Department; Trooper Jeffrey Luke Tillinghast; Deborah Yambor, GSC Counseling, who conducted a Section 5329 evaluation of Mother;[2] Alan Umstead, Jr., School Board Chairman, Shrewsbury Christian Academy; A.B.L., Father's wife; Dustin John Auffarth, Sr., Mother's former boss; Amanda Evans, Child's therapist in Pennsylvania; Christine Huffman, Principal, Shrewsbury Christian Academy; Shawna Hart, Office Manager, Shrewsbury Christian Academy; Verona Ashley Garland, Child's kindergarten teacher, Shrewsbury Christian Academy; Dr. Arnold T. Shienvold, custody evaluator, who conducted a custody evaluation and was stipulated as an expert in the field of psychology with an emphasis in custody evaluations involving high-conflict cases; and V.M., Maternal Grandmother. Mother and Father, represented by counsel, each additionally testified on their own behalf and submitted exhibits which were admitted by the court. In addition, the court spoke with Child.[3]

By order entered August 4, 2017, the court awarded the parties shared legal custody of Child, and awarded Father primary physical custody and

---

[2] Such an evaluation determines whether there exists a threat of harm due to a conviction or guilty plea for certain criminal offenses. **See** 23 Pa.C.S.A. § 5329(a).

[3] Both counsel for Mother and Father were present and given the opportunity to ask Child questions.

Mother partial physical custody of Child. Specifically, Father was awarded physical custody during the school year in Hawaii. Mother was awarded physical custody for up to one week per month in Hawaii with thirty days notice to Father, any break from school consisting of at least seven days, and during the summer. The order additionally addressed, among other things, holidays, transportation, communication, extracurricular activities, illness, and counseling. Thereafter, on August 29, 2017, Mother, through counsel,[4] filed a notice of appeal, along with a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).[5] The trial court issued an Opinion on September 5, 2017, analyzing each of the custody factors pursuant to 23 Pa.C.S.A. § 5328(a).[6] The trial court then issued an

_____

[4] Mother is represented by new counsel on appeal.

[5] Upon being granted leave by the trial court, Mother filed an Amended and Supplemental Rule 1925(b) Statement on October 18, 2017.

[6] While the trial court additionally provided a separate analysis of the relocation factors set forth in 23 Pa.C.S.A. § 5337(h), Opinion, 9/5/17, at 28-33, we determine that the instant matter does not require separate, distinct consideration of the relocation factors. *See D.K. v. S.P.K.*, 102 A.3d 467, 477-78 (Pa. Super. 2014) ("[A] custody case where neither parent is seeking to relocate and only the children would be moving to a significantly distant location if custody shifted from one parent to another does not *per se* trigger [S]ection 5337 of the Child Custody Act.") Rather, any relevant relocation factor not already incorporated by the court's consideration of the custody factors may be addressed under Section 5328(a)(16). *Id.* Although the court unnecessarily addressed the relocation factors, we will review its consideration of any such factors that Mother properly preserved as if decided under Section 5328(a)(16). Mother preserved a challenge to only one of the relocation factors, Section 5337(h)(7), which we discuss, *infra*. She waived any challenge to the remaining relocation factors because she did not raise the

- 7 -

Opinion in Support of Order Pursuant to Pa.R.A.P. 1925(a) on September 27,

2017, and an Opinion in Support of Order Pursuant to the Amended Pa.R.A.P.

1925(a) Statement of Errors on October 26, 2017.

On appeal, Mother raises four following issues, which we have reordered

for ease of discussion:

A. WHETHER THE DECISION OF THE COURT BELOW, GRANTING FATHER PRIMARY PHYSICAL CUSTODY, CONSTITUTED A GROSS ABUSE OF DISCRETION AND/OR ERROR OF LAW WHEN IT FAILED TO PROPERLY CONSIDER, ANALYZE, AND WEIGH THE STATUTORY FACTORS OF 23 Pa.C.S.[A.] §5328(a) IN ACCORDANCE WITH THE STANDARD OF THE CHILD'S BEST INTERESTS AND BASED ON THE EVIDENCE PRESENTED.

B. WHETHER THE DECISION OF THE COURT BELOW CONSTITUTED A GROSS ABUSE OF DISCRETION AND/OR ERROR OF LAW WHEN IT EXHIBITED BIAS, HOSTILITY, UNREASONABLENESS, PARTIALITY, PREJUDICE OR ILL–WILL TOWARD MOTHER.

C. WHETHER THE FAILURE OF THE COURT BELOW TO CONSIDER THE COMPETENT, UNCONTROVERTED EXPERT TESTIMONY AND REPORT AND RECOMMENDATION OF DR. ARNOLD SHIENVOLD CONSTITUTED A GROSS ABUSE OF DISCRETION AND/OR ERROR OF LAW.

D. WHETHER THE COURT BELOW COMMITTED AN ERROR OF LAW AND/OR ABUSE OF DISCRETION WHEN IT BASED ITS DECISION ON MERE PRESUMPTIONS AND NOT ON THE FACTS OF RECORD.

---

remaining relocation factors on appeal. ***See Krebs v. United Refining Company of Pennsylvania***, 893 A.2d 776, 797 (Pa. Super. 2006) (holding that an appellant waives issues that are not raised in both the concise statement of errors complained of on appeal and the Statement of Questions Involved in the brief on appeal).

Mother's Brief at 28.[7]

In custody cases under the Child Custody Act, ("the Act"), 23 Pa.C.S.A. §§ 5321-5340, our standard of review is as follows:

> In reviewing a custody order, our scope is of the broadest type and our standard is abuse of discretion. We must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand. However, we are not bound by the trial court's deductions or inferences from its factual findings. Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.

*C.R.F. v. S.E.F.*, 45 A.3d 441, 443 (Pa. Super. 2012) (citation omitted); *see also E.R. v. J.N.B.*, 129 A.3d 521, 527 (Pa. Super. 2015), *appeal denied*, 635 Pa. 754, 129 A.3d 521 (2016).

This Court consistently has held:

> The discretion that a trial court employs in custody matters should be accorded the utmost respect, given the special nature of the proceeding and the lasting impact the result will have on the lives of the parties concerned. Indeed, the knowledge gained by a trial court in observing witnesses in a custody proceeding cannot adequately be imparted to an appellate court by a printed record.

*Ketterer v. Seifert*, 902 A.2d 533, 540 (Pa. Super. 2006) (*quoting Jackson v. Beck*, 858 A.2d 1250, 1254 (Pa. Super. 2004)). In addition,

---

[7] Although Mother's issues were stated somewhat differently in her Rule 1925(b) statements, we find that Mother has preserved her challenges to the trial court's order.

[a]lthough we are given a broad power of review, we are constrained by an abuse of discretion standard when evaluating the court's order. An abuse of discretion is not merely an error of judgment, but if the court's judgment is manifestly unreasonable as shown by the evidence of record, discretion is abused. An abuse of discretion is also made out where it appears from a review of the record that there is no evidence to support the court's findings or that there is a capricious disbelief of evidence.

***M.A.T. v. G.S.T.***, 989 A.2d 11, 18-19 (Pa. Super. 2010) (*en banc*) (citations omitted).

Regarding the definition of an abuse of discretion, this Court has stated:

An abuse of discretion is not merely an error of judgment; if, in reaching a conclusion, the court overrides or misapplies the law, or the judgment exercised is shown by the record to be either manifestly unreasonable or the product of partiality, prejudice, bias or ill will, discretion has been abused.

***Bulgarelli v. Bulgarelli***, 934 A.2d 107, 111 (Pa. Super. 2007) (quotation omitted).The paramount concern in any custody case decided under the Act is the best interests of the child. ***See*** 23 Pa.C.S.A. §§ 5328, 5338. Section 5323 of the Act provides for the following types of awards:

**(a) Types of award.—**After considering the factors set forth in section 5328 (relating to factors to consider when awarding custody), the court may award any of the following types of custody if it is in the best interest of the child:

(1) Shared physical custody.

(2) Primary physical custody.

(3) Partial physical custody.

(4) Sole physical custody.

(5) Supervised physical custody.

(6) Shared legal custody.

(7) Sole legal custody.

23 Pa.C.S.A. § 5323(a).

Section 5328(a) sets forth the best interest factors that the trial court must consider. *See E.D. v. M.P.*, 33 A.3d 73, 79-80 n.2 (Pa. Super. 2011). Specifically, Section 5328(a) of the Act provides as follows:

**§ 5328.  Factors to consider when awarding custody**

**(a) Factors.**—In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving weighted consideration to those factors which affect the safety of the child, including the following:

(1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.

(2) The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.

(2.1) The information set forth in section 5329.1(a)(1) and (2) (relating to consideration of child abuse and involvement with protective services).

(3) The parental duties performed by each party on behalf of the child.

(4) The need for stability and continuity in the child's education, family life and community life.

(5) The availability of extended family.

(6) The child's sibling relationships.

(7) The well-reasoned preference of the child, based on the child's maturity and judgment.

(8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another.  A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

23 Pa.C.S.A. § 5328(a).

Further, with regard to custody, we have stated as follows:

. . . "**All** of the factors listed in [S]ection 5328(a) are required to be considered by the trial court when entering a custody order." **_J.R.M. v. J.E.A.,_** 33 A.3d 647, 652 (Pa.Super. 2011) (emphasis

in original). . . . The record must be clear on appeal that the trial court considered all the factors. ***Id.***

Section 5323(d) provides that a trial court "shall delineate the reasons for its decision on the record in open court or in a written opinion or order." 23 Pa.C.S.A. § 5323(d). Additionally, "[S]ection 5323(d) requires the trial court to set forth its mandatory assessment of the sixteen [Section 5328(a) custody] factors prior to the deadline by which a litigant must file a notice of appeal." ***C.B. v. J.B.,*** 65 A.3d 946, 955 (Pa.Super. 2013), *appeal denied*, [620 Pa. 727], 70 A.3d 808 (2013). . . .

In expressing the reasons for its decision, "there is no required amount of detail for the trial court's explanation; all that is required is that the enumerated factors are considered and that the custody decision is based on those considerations." ***M.J.M. v. M.L.G.,*** 63 A.3d 331, 336 (Pa.Super. 2013), *appeal denied*, [620 Pa. 710], 68 A.3d 909 (2013). A court's explanation of reasons for its decision, which adequately addresses the relevant factors, complies with Section 5323(d). ***Id.***

***A.V. v. S.T.***, 87 A.3d 818, 822-23 (Pa. Super. 2014).

In its opinion, the trial court carefully analyzed and addressed each best interest factor pursuant to Section 5328(a). Opinion, 9/5/17, at 15-28. In examining the factors, the court determined that Section 5328(a)(1), (2),[8] (4), (9), and (10) favor Father.

> First, the [c]ourt must determine which party is more likely to encourage and permit frequent and continuing contact between the child and another party. The parties were able to work together without a custody order prior to Mother's criminal difficulties. Mother had permitted the child to go to Hawaii to visit Father. Father then kept the child in Hawaii over Mother's objection.
>
> Mother would have the court, and everyone else, believe that Father acted unreasonably in withholding [] Child. However, that characterization shows a lack of insight by Mother about her

---

[8] It appears that the trial court considered Section 5328(a)(2) and (2.1) together.

culpability. The blame for any psychological harm to the child as a result of remaining in Hawaii, if any occurred, should be placed at the feet of the parent who endangered the child and not at the feet of the parent who acted to protect the child. At the time, Father learned that Mother had a criminal conviction of an enumerated offense under 23 Pa.C.S.[A.] § 5329 in which she had endangered the welfare of the child at issue. The public policy as expressed in this statute would have prevented the court from awarding custody to Mother until a threat of harm assessment was completed even if Father had not withheld custody. There were already trust issues between the parties based on Mother's infidelity during the marriage. The testimony of the police officer indicates that Mother downplayed the seriousness of the situation that led to her conviction. Father also learned that Mother would likely have an additional period of incarceration due to criminal charges for perjury in Maryland. The court finds specifically that Father had a reasonable basis, if not a duty, to act to ensure the safety of his child. Father thought that his child was at risk and based on the evidence presented, he had good cause to question the information that he was receiving from Mother.

Additionally, given the text messages that were provided, it is clear that Father provided telephone contact for Mother while trying to figure out what exactly was going on with Mother, even though the contact was not as extensive as Mother would have preferred. Mother filed in Pennsylvania, and Father participated in the litigation. Ultimately, Father agreed to a Stipulated Order returning the Child to Mother's primary care after Mother had a § 5329 evaluation.

On the other hand, while Mother was incarcerated in Maryland, she executed a guardianship agreement with her parents without informing or consulting with Father. She also ignored the court's Order with regard to listing Father as an emergency contact, thereby causing issues with the school. Additionally, she failed to accommodate Father's request for custody when he was in Pennsylvania in May 2017. Therefore, this factor favors Father.

Turning to the next factor, the [c]ourt must examine the present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party, and which party can better provide adequate physical safeguards and supervision of the child. Dr.

- 14 -

Shienvold testified that ultimately the decision comes down to safety, and the court agrees. However, Dr. Shienvold did not have the benefit of the police officer's testimony, [M]aternal [G]randmother's testimony, or the testimony of the school officials in making his decision as to which way to go on the safety issue. In summary, the court believes, given all of the evidence weighed with a consideration of credibility, that the safety issue actually strongly favors Father and not Mother. Mother's judgment is highly questionable as is her credibility. For purposes of this case, if the court takes Mother at her word, her incompetence raises more issues than her credibility. Comparing the police officer's testimony, especially to Mother's testimony regarding the incident on the second day of trial, Mother seems to believe her own lies. She stated as follows in response to questions by Father's attorney:

> Q. And do you now recognize that the information that you gave to Dr. Shienvold as well as your 5329 evaluators was not necessarily forthcoming with respect to what happened during that incident?
>
> A. Yes, I see that, but I also recognize - and I know what I did, I did say 10 minutes but to me when I walked out I was throwing up. I was sick. It may have been longer and I recognize this, but at the same time like my head was spinning. I recognize, yes, what I did and which I told Dr. Shienvold that there were drugs found in the house, yes, I do recognize.
>
> Q. So when you say you were sick, were you sick prior to the police?
>
> A. No.
>
> Q. So you were sick as a result of your reaction?
>
> A. Yes, like a totally emotional reaction. I walked outside and threw up.
>
> Q. You did in fact tell three different evaluators that you were only inside for 10 minutes?
>
> A. Yeah, I know I told the first one ten. I thought I told Dr. Shienvold it was between 10 and 20, but I

- 15 -

wasn't a hundred percent sure. If he remembers 10, then that's fine.

Q. Did you think it was appropriate in 20 something degree weather to leave P.L. in the car for even 10 minutes?

A. No. It was a bad judgement call. I recognize that.

This can be contrasted with the testimony of the police officer from the first day of trial:

When I confronted her about her possibly lying to me, she denied any wrong doing. I informed her because of the investigation, she would have to receive charges and a child line report would be created, at which point she said, okay she would tell me the truth. She went to visit that resident, not to pick up a jacket, and during the course of the investigation, she had also relayed to me that there was marijuana in the apartment where she was at. I had conducted field sobriety with her, and I'm very certain that she had not been using that night, based on what I had seen in her, but I did find in the apartment. . . . Prior to her leaving the scene, I had asked to see her phone with the conversations with the resident of the apartment complex. I don't have it with me today, but I had taken a photograph of the last message that she sent him saying that she was outside with the police and for him to tell us that she had only been there for 15 minutes.

It can also be contrasted with Mother's verified statement on her Criminal Record/Abuse History Verification filed February 6, 2017, in which Mother described the incident as follows:

Fall 2014 I left my child unattended in my car. When I returned 10 minutes later, police were on the scene and I was charged. CYS investigated and closed with no safety plan or services recommended.

What strikes the court is that, on July 20, 2017, Mother came up with the excuse that she was sick at the time of the incident to explain her time confusion when according to the police

officer,[9] in November 2014 during the incident, Mother had the presence of mind to text her friend asking him to lie about the time. Mother also lied on her verified statement, sticking with the 10-minute story she told the evaluators, including Dr. Yambor and most likely Dr. Shienvold.

Mother raised abuse issues related to Father. However, there were never any criminal charges filed nor even a Protection from Abuse Order requested. Maternal Grandmother testified that she saw Father abuse Mother in North Carolina, and then left her daughter in that situation without calling the police or putting in place any measures to protect her daughter. Then, years later when custody was at issue, Maternal Grandmother took it upon herself to write to Father's superior officer to allege abuse. The court finds the details more convenient than credible. Alternatively, Maternal Grandmother is an enabler who is providing no safe guards [sic] to Mother or the child, either in her prior situation or her current situation. Maternal Grandmother, at the time of trial, still had her head in the sand with regard to her daughter's endangering incident and did not know, or did not care about the details that put her granddaughter at risk.

No credible evidence was presented that Father ever abused the child. Nonetheless, the court does believe that Father has anger management issues. The school personnel and Dr. Shienvold indicated that Father engaged in inappropriately angry behavior toward them. The court was particularly concerned that Father yelled at the school board president on the phone while the child was in the car with him. However, no one, not even Mother or Maternal Grandmother, provided any credible evidence or testimony that Father was abusive toward the child. Step[]mother testified that she has not witnessed any anger management issues or abuse toward her. There is no excuse for Father's behavior, and he seems to play right into Mother's hands when she sets him up by actions such as shutting him out of the child's involvement in school, showing up with a video camera to tape Father at the school, failing to be truthful with him regarding the endangering incident, and exaggerating the issues created by Father's anger management issues. The court has put in place anger management counseling for Father as a preventative measure to

_____

[9] We observe that the evaluation of Deborah Yambor does indicate that Mother reported vomiting. Exhibit Q, GSC Counseling 5329 Evaluation, at 2.

avoid incidents and to give Father the skills he needs to respond appropriately when Mother pushes his buttons, especially in front of or toward others involved in their custody matters.

However, anger management issues do not necessarily translate to safety issues. There is no credible evidence that Father has abused the child, nor that there is any abuse in his current household. The question is which party can better provide adequate physical safeguards and supervision of the child. In fact, § 5328 specifies that the court should "give weighed consideration to those factors which affect the safety of the child." If Father were closer so that he could monitor Mother better, if the court could trust that Maternal Grandmother would provide better supervision instead of enabling Mother, and if Mother were more truthful and forthcoming with information, then the court would not have the same serious concerns about the child remaining in Mother's primary care. However, based on the current situation, the court must give considerable weight to this factor and finds that it strongly favors Father.

. . .

The next factor for consideration is the need for stability and continuity in the child's education, family life and community life. Both parties have stability issues. Father indicated that he intends to move to North Carolina following his military service in Hawaii. Mother is currently living in her parents' basement, although she indicated that she is looking at houses with her fiancé. While Mother indicated that she intends to remain in the same school district where she is currently living, that area is very rural. Mother cannot ensure that she and her fiancé will locate housing in the same school district, and the court does not find that Mother is realistic or credible in stating that the child will definitely remain in the same school district if in her custody for the upcoming school year. Mother also had an interruption in her availability for thirty days due to her incarceration. Focusing instead on the reasons for instability, the court is really comparing a father whose lack of stability is caused by his serving his country and a mother with an unstable work history and two serious criminal difficulties who may or may not continue to live in her parents' basement. Therefore, this factor strongly favors Father.

. . .

The next consideration is which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child. This is another factor where the court is not sure whether Mother's stated incompetence is not worse than her lack of credibility. If the court is to believe Mother's version, in completing a marriage license, she was unsure and inaccurate with regard to her own legal name, age, and marital status, thereby creating her perjury charge. If Mother were to engage the same lack of attention to detail in completing the child's educational or medical forms, she could put the child substantially at risk. Additionally, if the court is to believe Mother's version, she did not realize that the guardianship agreement she gave to her parents, without Father's knowledge or consent, related at all to legal custody, even though she went to court over custody and had legal custody defined for her in her presence according to the Order dictated on March 28, 2016. The court seriously doubts whether the U.S military would allow Father to have such a lack of attention to detail. Mother similarly admitted that she lacked judgment with regard to the November 2014 incident, ignoring the court's Order with regard to putting Father as an emergency contact on the school forms, and attempting to videotape Father when he came to pick up the child at school when she had no reason to be there. These are only the incidents about which Father from Hawaii was able to obtain evidence. It creates serious concerns about Mother's judgment at other times. Therefore, this factor strongly favors Father.

*Id.* at 15-22, 24-26. Conversely, the court determined that Section 5328(a)(3), (5), and (6)[10] favor Mother.

Next, the parental duties performed by each party on behalf of the child must be considered. The court was particularly disturbed by the way that Mother poisoned the well for Father with the child's school while failing to inform them that she had a serious criminal conviction that should have affected her ability to volunteer. Father then played right into Mother's hands by his reaction. Together, they both made it next to impossible for the child to have continued in her prior school without the school personnel needing to contact the board and/or their attorney prior to any interaction with either parent. Supporting the child in her

---

[10] Despite finding that this factor favors Mother, the court found that safety and stability considerations outweigh it as it relates to Child's best interests.

- 19 -

school appropriately is an important parental duty in which both parents failed.

Mother has been the primary physical custodian of the child for extended periods time. The court separates periods of time when Father was deployed versus the periods of time when he was state-side, even though he was stationed in Hawaii. Again, to the parties' credit, Father was agreeable to Mother maintaining primary custody even during periods that he was not deployed. In accordance with 51 Pa.C.S.[A.] § 4109, the court does not hold any periods of deployment against Father with regard to the time that he was unavailable to parent the child.

With regard to counseling, Mother was quicker at realizing that counseling would be helpful for the child. Father's resistance to counseling under the circumstances, especially given the distance between the parties, the child's exposure to a dangerous situation by Mother, and the removal of the child from Mother's custody for a period of time, shows a lack of insight into the mental health needs of the child. Nonetheless, Father does seem to have been able to put the appropriate counseling in place and attend to [] Child's needs during the periods of times that she has been in Hawaii. However, this factor slightly favors Mother.

. . .

The [c]ourt must next consider the availability of extended family. Mother's extended family is in York. Mother currently lives with her parents. While Father resides with Step[]mother in Hawaii, he did not present extensive testimony with regard to the child's relationship with any of his family other than Step[]mother and grandparents in Florida. While the court was not impressed by Maternal Grandmother in that, according to her, she left her daughter in an abusive situation and then inserted herself in the custody matter by writing to Father's superior officer, the child would nonetheless have more of a relationship with Mother's extended family than Father's. The court notes that when Father was asked why he wanted to move to North Carolina after his military service, he indicated that his reason for moving there was the weather. This indicates to the court that weather seems to be more important to Father than family connections. Therefore, this factor strongly favors Mother.

- 20 -

The next consideration is the child's sibling relationships. [] Child has a half-sibling in Mother's home. Father currently does not have any children with his current wife, or any other siblings or half-siblings in his care. Therefore, this factor favors Mother. However, the court finds that on the whole, the safety and long-term stability of the child provide compelling reasons to separate the child from her half-sibling in Mother's home during the school year. [] Child seems happy with [F]ace[T]ime contact in both homes, and certainly efforts can and should be made by both parents to ensure [F]ace[T]ime contact between [] Child and her sibling while in Father's custody. Obviously, [] Child is in school during the day during the school year, and the summer may provide for more quality interactions between the siblings.

*Id.* at 20-23. Further, Section 5328(a)(7), (8), (12), and (13) were found to be neutral.[11]

The next factor is the well-reasoned preference of the child, based on the child's maturity and judgment. [] Child was quite chatty with the court, although she expressed no preference with regard to custody. Regarding Mother's house, [] Child indicated that her best friend was her cousin, whom she sees once a year. With her mom, [] Child likes to swim, go to carnivals, and watch Ravens football games. She said that Mother's fiancé, [S.], mostly plays video games. While [] Child has her own room, she rarely sleeps there, preferring to share the couch in the basement with her mom while [S.] sleeps in the bed. [] Child does have a good connection with her younger half-sibling and has been helping with a party for him. Regarding Father's house, she said that she likes Step[]mother and that Step[]mother comes along when Father and [] Child go somewhere fun. [] Child has pets in Father's home and misses them when not there. She has her own room there but gets scared there too. She likes going to the beach when with Father. Notably, the parents raised issues related to Face[T]ime/Skype, but [] Child seemed comfortable with the level of communication. [] Child was given the opportunity to express

---

[11] In addition, as to Section 5328(11), the court notes that "the distance between the parties necessitates an order where one parent has the child during the school year with the other parent having custody over the summer." Opinion, 9/5/17, at 26. Further, the court determined Section 5328(a)(14) and (15) not to be substantial or significant factors. *Id.* at 27-28.

- 21 -

an opinion or provide additional information, and [] Child declined to do so. Therefore, this factor is neutral.

The next factor to consider is the attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary. Mother would have the court believe that Father's keeping the child in Hawaii would be an attempt to turn the child against Mother. However, as stated above, the court finds that given Mother's guilty plea to an enumerated offense as well as her level of deceit, Father's actions were not only reasonable, but stemmed from his duty as a parent to protect the child. Mother does not seem to have any insight to the fact that, due to the child's school schedule, the child will need to be away from a parent during most of the school year, no matter where she lives. Mother's poisoning the well at the child's school was inappropriate as was Father's yelling at the school board member with the child in the car seat in the car. Both parents need to do a better job of putting their differences aside, especially in front of the child. Therefore, this factor is neutral.

. . .

The next enumerated factor is each party's availability to care for the child or ability to make appropriate child-care arrangements. Mother was not working outside the home at the beginning of the trial but had gotten a job as a bartender by July. Father only works two (2) hours a day most days with all his work hours overlapping school hours. [] Child would be starting first grade in a different school if with Mother, as both parents burned bridges at [] Child's prior private school. Father testified that the public school [] Child would attend at his residence is about ten minutes away, and that it is actually on the military base. (N.T. 6/1/17 at 78). Both parties presented evidence regarding reasonable child-care plans. Mother has family members in the home to care for [] Child. Father and Step[]mother are able to provide most of the care for [] Child in their home. Father has appropriate supplemental care ten minutes away just outside the gate to the base. Therefore, this factor is neutral.

The [c]ourt must next consider the level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. The level of conflict between the parties is high. The court finds that both parties have contributed

equally to their communication difficulties. Mother has been less than truthful in her dealings with just about everybody, including Father. She also has pushed Father's buttons by attempting to shut him out and videotape him. Father has played into her hands by letting his anger management issues get the best of him in dealing with Mother and others involved in the custody situation such as school personnel and Dr. Shienvold. The court hopes that the counseling put in place by the court will help to alleviate the impact on the child of the communication difficulties between the parents. The court believes that Father's anger management issues may be more easily remedied than Mother's deceit and lack of judgement [sic]. Nonetheless, currently this factor is neutral.

*Id.* at 23-24, 26-27. As such, the court concluded and summarized as follows:

## **CONCLUSION**

The [c]ourt has considered the factors outlined by 5328 and 5337 of the Custody Act as outlined above in rendering a decision that is in the best interests of the child. In summary, Mother has established a pattern of poor judgment and deceit that that has at times risen to the level of criminal behavior that has compromised the stability and safety of the child. She lacks insight into how her poor decision-making is affecting her custody situation. If [] Child were to stay with Mother, [] Child would be switching schools and most likely residences in the upcoming year. She has no deep ties to people or activities outside of Mother's household members. Father is the more mature, safe, and stable parent. With counseling, the court believes that Father's anger management issues can be addressed, while Mother's poor judgment is less likely to be remedied. The distance between the parties requires that the child will be absent from one parent for most of the school year. Therefore, for the reasons outlined above, the [c]ourt awards shared legal custody to the parties. Father is awarded primary physical custody subject to Mother's rights of partial physical custody. The schedule for custody was outlined on the Order filed August 4, 2017.

*Id.* at 37-38.

- 23 -

Turning to Mother's issues raised on appeal, Mother first challenges the trial court's analysis of the Section 5328(a) custody factors. Mother's Brief at 48. Mother argues:

It is clear from the record that the trial court's analysis of the custody factors is flawed. In its analysis the court continues to over-emphasize Mother's shortcomings while at the same time downplaying Father's faults. The evidence showed that it is in the best interest of the child for Mother to have primary physical custody.

*Id.* at 48. She continues:

In performing its analysis of the factors, the trial court failed to appropriately consider the facts of record. It continued to focus on past issues. To consider facts existing prior to or at the time of the prior order leads to the re-litigation of issues already determined and would lay the foundation for interminable and vexatious litigation.

*Id.* at 66.

With regard to the custody factors, we have stated that the trial court is required to consider all of the Section 5328(a) factors in entering a custody order. *J.R.M. v. J.E.A.,* 33 A.3d 647, 652 (Pa. Super. 2011). Although the court is required to give "weighted consideration to those factors which affect the safety of the child" pursuant to 23 Pa.C.S.A. § 5328(a), we have acknowledged that the amount of weight a court gives any one factor is almost entirely discretionary. *M.J.M. v. M.L.G.*, 63 A.3d 331, 339 (Pa. Super. 2013). Critically, as we stated in *M.J.M.*:

**It is within the trial court's purview as the finder of fact to determine which factors are most salient and critical in each particular case**. *See A.D. v. M.A.B.,* 989 A.2d 32, 35-36

- 24 -

(Pa.Super. 2010) ("In reviewing a custody order ... our role does not include making independent factual determinations....  In addition, with regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand.").  Our decision here does not change that.

*Id.*  (emphasis added).  Further, while a parent's role in caring for a child may be considered in light of the statutory factors, "the primary caretaker doctrine, insofar as it required positive emphasis on the primary caretaker's status, is no longer viable." *Id.*

As we construe this issue, we interpret the issue raised at its core as a dispute to the trial court's findings of fact and determinations regarding credibility and weight of the evidence.  Mother, in essence, questions the trial court's conclusions and assessments and asks this Court to re-find facts, re-weigh evidence, and/or re-assess credibility to her view of the evidence.  This we cannot do.  Under the aforementioned standard of review applicable in custody matters, the trial court's findings of fact and determinations regarding credibility and weight of the evidence are not disturbed absent an abuse of discretion.  *See C.R.F.*, 45 A.3d at 443; *see also E.R.*, 129 A.3d at 527.  As we stated in *King v. King*, 889 A.2d 630, 632 (Pa. Super. 2005):

> It is not this Court's function to determine whether the trial court reached the 'right' decision; rather, we must consider whether, 'based on the evidence presented, given [sic] due deference to the trial court's weight and credibility determinations,' the trial court erred or abused its discretion. . . .

(quoting **Hanson v. Hanson**, 878 A.2d 127, 129 (Pa. Super. 2005)). After a thorough review of the record, we find no abuse of discretion. Further, to the extent Mother challenges the weight attributed to any factor by the trial court, we likewise find no abuse of discretion. As stated above, the amount of weight that a trial court gives to any one factor is almost entirely within its discretion. **See M.J.M.**, 63 A.3d at 339.

In the case *sub judice*, the trial court exhaustively and reasonably analyzed and addressed each factor under Section 5328(a). **See** Opinion, 9/5/17, at 14-28. After careful review of the record, we determine that the trial court's findings and determinations regarding the custody factors set forth in Section 5328(a) are supported by competent evidence in the record, and we will not disturb them. **See C.R.F.**, 45 A.3d at 443; **see also E.R.**, 129 A.3d at 527. Thus, this claim fails.

In her second issue, Mother claims that the trial court abused its discretion and/or erred as it exhibited bias, hostility, unreasonableness, partiality, prejudice or ill-will toward her. Mother's Brief at 36. Mother argues that the record reveals a bias and prejudice against her on the part of the trial judge. **Id.** at 38. She maintains that the trial court focused on her endangerment charge to the exclusion of two Section 5329 evaluations and a custody evaluation, and Father stipulating to an order awarding primary physical custody of Child to Mother despite Mother's endangerment and

perjury charges.[12]  *Id.* at 38-41.  Mother further submits that the trial court held her to a different standard than Father, pointing to examples of the court requesting photographs of her home and information as to the school district where she resides.  *Id.* at 41-44.  Moreover, the trial court found that Mother "poisoned the well" with Child's school as to Father, disregarding completely Father's behavior as well as the court's own actions in questioning school personnel.  *Id.* at 42.  Finally, Mother indicates that the "trial judge continually interjected itself in the examination of witnesses, conducting lengthy examination on issues not raised by either party," highlighting the court's questioning of Maternal Grandmother.  *Id.* at 44-45.  While recognizing a trial judge's duty to develop the record, if necessary, Mother argues that the court did so in a manner that was one-sided and presented, at the least, an appearance of bias.  *Id.* at 45-46.

As to this claim, the trial court reasoned,

> The second issue raised is whether there was an error of law or an abuse of discretion when the [c]ourt "exhibited unreasonableness, partiality, prejudice, bias, and ill-will" to Mother through a process of "overemphasizing" Mother's poor characteristics and "downplaying" Father's poor characteristics. This [c]ourt disagrees.  In fact, there are several times throughout the three days' worth of trial that this [c]ourt took issue with both parties for their actions, their poor communication, their anger management issues, and their need for counseling.  The record contains several examples.  The problem is that Father's poor characteristics paled in comparison to Mother's poor judgement [sic] and outright dishonesty time and time again when looked at

---

[12] We note that these were, in fact, convictions as a result of guilty pleas by Mother.

- 27 -

> from the best interest of the child, and more important the safety of the child. Therefore, this issue should be dismissed.

Opinion in Support of Order Pursuant to the Amended Pa.R.A.P. 1925(a) Statement of Errors, 10/26/17, at 3.

In the instant matter, we observe that there was no objection raised by Mother during the relevant proceedings as to any of the court's requests or inquiries noted by Mother. At no time did Mother's counsel protest the court's actions or suggest any ill motive or prejudice against Mother, nor did counsel request that the court recuse itself due to any impropriety or appearance thereof. As such, we find that Mother's challenge is waived. *See* Pa.R.A.P. 302(a) (providing for waiver of issues not first raised in lower court); ***Fillmore v. Hill***, 665 A.2d 514, 515-16 (Pa. Super. 1995) ("[I]n order to preserve an issue for appellate review, a party must make a timely and specific objection at the appropriate stage of the proceedings before the trial court. Failure to timely object to a basic and fundamental error, such as an erroneous jury instruction, will result in waiver of that issue. On appeal, the Superior Court will not consider a claim which was not called to the trial court's attention at a time when any error committed could have been corrected.") (citations omitted).

Nonetheless, even if preserved, we would find this claim to be without merit. As discussed above, a review of the record reveals that the trial court's findings and determinations are supported by competent evidence in the record. ***See C.R.F.***, 45 A.3d at 443; ***see also E.R.***, 129 A.3d at 527.

In her third issue, Mother asserts that the trial court abused its discretion and/or erred in dismissing the expert testimony of Dr. Shienvold. Mother's Brief at 67. She states:

It is an abuse of discretion for a trial court to dismiss as unpersuasive, uncontracted [sic] expert testimony. [**M.A.T. v. G.S.T.**], 989 A.2d 11[] (Pa. Super. 2010). While a trial court is not obligated to accept the conclusions of an expert, it is required to give due consideration to his testimony. [**K.W.B. v. E.A.B.**], 698 A.2d 609[] (Pa. Super. 1997). If the trial court chooses not to follow the expert's recommendations, its decision must be supported by competent evidence of record. [**M.A.T. v. G.S.T.**], 989 A.2d 11[] (Pa. Super. 2010).

**Id.** Comparing the matter to **K.W.B.**, Mother suggests, without supporting evidence, that the court disregarded the opinion of Dr. Shienvold, the only expert, that primary physical custody of Child should remain with Mother. **Id.** at 67-68. She further maintains, "In spite of Dr. Shienvold's clear and well-reasoned testimony, the trial court discounted his expert opinion and allowed its bias to affect its award of custody. The record does not support the trial court's decision to discount Dr. Shienvold's testimony." **Id.** at 71.

Related to Dr. Shienvold, the trial court stated, "While the court has tremendous respect for Dr. Shienvold's opinion, the court has reached a different result most likely due to differences in the evidence available, especially as it relates to credibility and a safety determination." Opinion, 9/5/17, at 28.

In its subsequent Rule 1925(a) Opinion, the court further elaborated as to Dr. Shienvold's opinion as follows:

The sixth issue addressed was whether there was an error of law or an abuse of discretion by the court when it disregarded the expert report and testimony of Dr. Arnold Shienvold. The [c]ourt is not required to consider the opinion of an expert, and the [c]ourt did in fact consider the opinion of Dr. Shienvold in its analysis. Therefore, the [c]ourt did not abuse its discretion or commit an error of law.

While it "may be true that, when [an] expert evaluation is uncontradicted or unqualified, a child custody court abuses its fact finding discretion if it totally discounts [the] expert evaluation." [**Nomland v. Nomland**, 813 A.2d 850, 854 (Pa. Super. 2002)]. "To say that a court cannot discount uncontradicted evidence, however, is merely to rephrase the requirement that a child custody court's conclusion have competent evidence to support it." [**Id.**,] *citing* [**Reefer**], 791 A.2d at 374. In this case, however, it was contradicted. Specifically, Dr. Shienvold did not have the benefit of all of the exhibits and testimony. It was clear from the record that Mother lied to all of the evaluators, including Dr. Shienvold[,] about the incident that lead to her criminal difficulties. Therefore the [c]ourt was compelled to discount his testimony as the foundation of it was flawed. "So long as the trial court's conclusions are founded in the record, the lower court [is] not obligated to accept the conclusions of the experts." [**Id.**,] *citing* [**Murphey v. Hatala**, 504 A.2d 917, 922 (Pa. Super. 1986)]. "[T]he trier of fact is not bound by the testimony of any expert witness and is under no obligation to accept the conclusions of an expert witness." [**Murphey**], 504 A.2d at 922.

The opinion of Dr. Arnold Shienvold is qualified and contradicted, and therefore the [c]ourt was under no obligation to consider the expert's opinion. The testimony of both Mother and Father, as well as [M]aternal [G]randmother, police officers, and even school officials shows that there are far deeper issues than the surface that Dr. Shienvold scratched when it comes to this family.

Despite not being required to consider the opinion of Dr. Shienvold, the [c]ourt's Opinion shows that the [c]ourt did consider the expert's analysis, among other considerations. The [c]ourt, despite its tremendous respect for Dr. Shienvold's opinion, reached a different conclusion possibly based on difference of evidence and testimony available to the [c]ourt, especially as it relates to credibility and safety concerns. This [c]ourt had the opportunity to observe both parties over three

days of testimony. Mother clearly pushed Father's buttons, but failed to demonstrate a nexus between Father's anger management and the child's safety. Notably, this [c]ourt observed Mother's demeanor repeatedly change from a normal adult demeanor to a child-like demeanor every time she was caught in a lie or circumstance of "questionable judgment." This obvious contrast in demeanor added to Mother's credibility issues.

In [**Nomland**], the Superior Court considered a similar challenge to a trial court's handling of expert testimony. [**Nomland**], 813 A.2d at 855. The Superior Court concluded that while the trial court was not required to accept conclusions of experts, like in the present case, the trial court did consider the experts['] opinion. [**Id.**] The court held that "the trial court's factual findings, [] based on factual analysis independent of the experts' analysis, support its conclusions." [**Id.**]

Dr. Shienvold himself testified that the ultimate decision should come down to the safety of the child, and the [c]ourt wholeheartedly agrees. That is ultimately why the [c]ourt reached a different conclusion than reached by the expert based on the totality of the evidence presented and the credibility determinations of the [c]ourt.

Opinion in Support of Order Pursuant to Pa.R.A.P. 1925(a), 9/27/17, at 5-7.

On this topic, we have stated:

The trial court was under no obligation to delegate its decision-making authority to [the custody evaluator]. ***See, e.g., K.W.B. v. E.A.B.,*** 698 A.2d 609, 613 (1997). It is an abuse of discretion, however, for a trial court to dismiss "as unpersuasive, and to totally discount, uncontradicted expert testimony." ***Murphey***, 504 A.2d at 922; ***see also Rinehimer v. Rinehimer***, 336 Pa. Super. 446, 485 A.2d 1166, 1169 (1984) (while not required to accept their conclusions, "[t]he lower court was obligated to consider the testimony of the two experts[.]"); ***Straub v. Tyahla***, 274 Pa. Super. 411, 418 A.2d 472, 476 (1980) ("[W]e conclude that the lower court abused its discretion in totally discounting as unpersuasive the expert opinion testimony of appellant's testifying psychiatrist."). Accordingly, while a trial court is not required to accept the conclusions of an expert witness in a child custody case, it must consider them, and if the trial court chooses not to follow the expert's recommendations, its independent decision must be supported by competent evidence

- 31 -

of record. **See Nomland** [ ]*,* 813 A.2d [at] 854 [] ("To say that a court cannot discount uncontradicted evidence, however, is merely to rephrase the requirement that a child custody court's conclusion have competent evidence to support it. So long as the trial court's conclusions are founded in the record, the lower court was not obligated to accept the conclusions of the experts.") (citations and quotation marks omitted).

**M.A.T.**, 989 A.2d at 19-20.

Instantly, we find that the trial court considered Dr. Shienvold's expert recommendation, and we conclude that its decision not to follow his expert recommendation is supported by competent evidence of record. **M.A.T.**, 989 A.2d at 19-20; **Nomland**, 813 A.2d at 854. Thus, we find no error of law or abuse of discretion.

Lastly, with her fourth issue, Mother argues that the trial court abused its discretion and/or erred as it based its decision to grant Father primary physical custody in Hawaii on mere presumptions and not facts of record. Mother's Brief at 72. Mother purports that the trial court is "enthralled with the thought of living in Hawaii. . . ." **Id.** at 72. She asserts that the trial court suggests that residing in Hawaii would enhance Child's quality of life and provide a cultural and educational opportunity, without any such supporting evidence. **Id.** at 72-73.[13] **Id.** at 73. Mother avers, "Father presented no

_____

[13] Mother's fourth issue does not directly challenge the trial court's assessment of the relocation factors, but focuses on whether the evidence supported the trial court's determination that living in Hawaii would provide Child with a better quality of life. Mother's Brief at 72-73. Section 5337(h)(7) of the relocation factors required the court to assess, "[w]hether the relocation will enhance the general quality of life for the child, including, but not limited to,

testimony that Hawaii afforded the child a better quality of life. In fact, Father testified to very little about what the child's life would be like in Hawaii."

In addressing evidence as to Child's life in Hawaii, the trial court reasoned as follows:

> The eighth issue addressed was whether there was an error of law or an abuse of discretion when the court awarded Father primary custody without testimony from Father regarding the child's living conditions and the school that would be attended in Hawaii. Father lives on a military base in Hawaii. If he sends the child to a public school while the child resides with Father, it will be a school that is ten minutes away on the military base. This [c]ourt can assume that the military is more than capable of teaching to a six[-]year[-]old. The [c]ourt can assume that the military provides adequate housing and schools on its military base. Mother has produced no evidence to indicate the housing or schooling would be inadequate for the [c]ourt to consider such an allegation, despite the fact that she had adequate counsel and an ample opportunity over three days of testimony.

> Furthermore, Father has indicated that the child has her own room and bathroom that she has picked out and decorated at Father's home. The child would not be forced to reside in the basement of her maternal grandmother's with her mother and mother's fiancé, as she does now. Therefore, this has been addressed in testimony.

Opinion in Support of Order Pursuant to Pa.R.A.P. 1925(a), 9/27/17, at 7-8 (citations to record omitted). **See also** Opinion in Support of Order Pursuant to the Amended Pa.R.A.P. 1925(a) Statement of Errors, 10/26/17, at 3-4 (citations to record omitted).

---

financial or emotional benefit or educational opportunity," with regard to this claim. 23 Pa.C.S.A. § 5337(h)(7). Thus, we find that Mother does challenge Section 5337(h)(7) in her appeal.

Upon review, this claim is without merit. As indicated, the trial court's decision and analysis is supported by competent evidence of record. ***See C.R.F.***, 45 A.3d at 443; ***see also E.R.***, 129 A.3d at 527.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/2/2018