Dawn NOMLAND, Appellant

v.

Lloyd NOMLAND, Appellee.

Superior Court of Pennsylvania.

Argued Nov. 19, 2002.

Filed Dec. 12, 2002.

Jeffrey P. Paul, Pottsville, for appellant.

John M. Hampton, Ashland, for appellee.

Before: STEVENS, OLSZEWSKI, and BECK, JJ.

OLSZEWSKI, J.

¶ 1 Dawn Nomland Cook ("mother") appeals from the custody order entered by the Court of Common Pleas of Schuylkill County. Generally, mother contends that the court's conclusions are not supported by competent evidence. More specifically, mother argues that the court inadequately considered the expert analysis offered below and that the court's decision to separate the children was error. We disagree and affirm.

1.

¶ 2 The trial court summarized the facts and procedural history of this case as follows:

Initially the custody issue involving all five of the Nomland children was litigated before [the trial court] in December of 1998. At the time of that litigation home evaluations were ordered by [the trial court], a thorough custody evaluation was ordered with regard to all the parties at issue as well as the children, that evaluation being completed by Ms. Marilyn Davenport, a court-appointed custody evaluator. Following a full hearing which included interviews of each of the minor children, primary physical custody was awarded to ... Father by Order dated January 14, 1999. That Order afforded ... Mother generous partial custody every other weekend, extended partial custody during summer months, and additional partial custody over holidays and where such custody could be arranged by the parties. The original Order of January 14, 1999 was specific as to the minor children at issue before [the trial court] at the ... time [of the drafting of trial court opinion], and included Sarah Nomland, but was not specific as to the eldest Nomland child, Emily. Because of the severe estrangement between Emily Nomland and her Mother, [appellant] here, partial custody and visitation regarding Emily was to be on an open basis at a time when some meaningful contact between Emily and her Mother could be established following intervention. [Emily Nomland has reached the age of majority and is no longer subject to this dispute.]

The Custody Order of January 14, 1999 remained in effect, at least as to the terms of the Order, until December 4, 2000, when that Order was modified by stipulation of the parties. During November of 2000, in contravention of the Custody Order of January of 1999, Sarah Nomland left her Father's residence and took up primary residence with her Mother. On November 21, 2000, [Mother] filed a petition for modification of the January, 1999 Custody Order seeking primary physical custody of Sarah Nomland due to changes within the household of Mr. Nomland (his remarriage) and allegations of an estranged relationship that had developed between Sarah and her Father. Following a custody conciliation conference the parties, in consultation with their daughter, Sarah, agreed to a modification of the January 14, 1999 Order whereby Sarah would remain in primary custody of her Mother with partial custody afforded to [Father] in a virtually identical fashion as the order for partial custody existed as to the non-custodial parent in the Order of January 14, 1999. Sarah was to visit with her Father on weekends opposite the partial custody visita-

tions of the other children, with the design being that all four of the children would be with the respective non-custodial parent each weekend. As indicated that custody change was entered into by agreement of the parties and included acquiescence by Sarah Nomland who, at the time, wanted to reside with her Mother. Despite the partial custody requirements of that Order, which was entered December 4, 2000, Sarah visited with her Father on only three occasions prior to the modification hearing in December of 2001. Twenty one days after the stipulated Custody Order of December 4, 2000, [Mother] filed a petition for modification with regard to Jonathan and Justin Nomland asserting that since Sarah was now in primary custody of . . . Mother the boys sorely missed their sister, and wanted to relocate with . . . Mother.

As a result of modification petition of December 19, 2000 an Order was issued on December 21, 2000 directing that a custody conciliation conference take place on January 1, 2001 regarding the petition related to Jonathan and Justin. The custody conciliation conference eventually took place on January 26, 2001 at which time it became clear that an additional custody evaluation of the parties and minor children was necessary, to include additional home evaluations. As such on March 12, 2001, [the trial court] directed that the parties submit to home and custody evaluations by Peter H. Thomas, Ph.D., a court-appointed custody evaluator. Prior to completion of the court ordered custody evaluation, Jessica Nomland relocated to her Mother's home. This occurred following Jessica's summer partial custody period with her Mother, at which time she elected not to return to her Father's home. Since that de facto alteration of the Order of December 4, 2000, Jessica

has failed to visit or be engaged in partial custody with her Father.

The ordered custody evaluations were completed on August 2, 2001, a second custody conciliation was scheduled for August 21, 2001, at which time it became apparent that conciliation was not going to be an effective way to resolve the pending custody petitions. As previously noted on September 13, 2001, [Mother] filed an amended petition for modification, which included a request for primary physical custody of Jessica Nomland, although a de facto change in custody of Jessica had taken place during the summer of 2001. The issue of modification was heard before [the trial court] on three separate hearing dates and included testimony from the parties, their now respective spouses, the custody evaluator (Dr. Thomas), a family counselor (Martena Schnerring), as well as several lay witnesses on behalf of [Father]. As a result of those hearings [the trial court] determined that the best interests of the minor children, Sarah and Jessica Nomland, should be with [Mother], together with some form of counseling to reinstitute a normal partial custody schedule with [Father]; and that primary custody of the minor children, Jonathan and Justin Nomland, should be with . . . Father, continuing the existing partial custody schedule in favor of [Mother].

Trial Court Opinion, 6/19/02, at 2–5.

### 2.

When reviewing custody orders, [t]he appellate court is not bound by the deductions or inferences made by the trial court from its findings of fact, nor must the reviewing court accept a finding that has no competent evidence to support it. . . . However, this broad scope of review does not vest in the

reviewing court the duty or the privilege of making its own independent determination.... Thus, an appellate court is empowered to determine whether the trial court's incontrovertible factual findings support its factual conclusions, but it may not interfere with those conclusions unless they are unreasonable in view of the trial court's factual findings; and thus, represent a gross abuse of discretion.

*Reefer v. Reefer,* 791 A.2d 372, 374 (Pa.Super.2002) (language omitted in original) (quoting *Kaneski v. Kaneski,* 413 Pa.Super. 173, 604 A.2d 1075, 1077 (1992)).

¶ 3 Mother's argument on appeal, as she presents it, consists of five parts:

THE LOWER COURT ERRED AND ABUSED ITS DISCRETION IN REFUSING TO TRANSFER CUSTODY OF THE PARTIES SONS TO MOTHER, SINCE THE LOWER COURT'S DEDUCTIONS AND INFERENCES WHICH IT MADE IN ARRIVING AT ITS DETERMINATION ARE NOT SUPPORTED BY THE FACTS OR BY COMPETENT EVIDENCE.

THE LOWER COURT ERRED AND ABUSED ITS DISCRETION IN TOTALLY IGNORING THE RECOMMENDATION OF THE CUSTODY EVALUATOR THAT MOTHER HAVE PRIMARY PHYSICAL CUSTODY OF HER SONS DURING THE WINTER MONTHS, AND BY FAILING TO INDICATE WHY IT WAS REJECTING THE UNCONTRADICTED TESTIMONY OF DR. THOMAS THAT IT IS IN THE BEST INTERESTS OF THE CHILDREN TO BE WITH MOTHER DURING THE SCHOOL YEAR.

THE LOWER COURT ERRED AND ABUSED ITS DISCRETION IN DETERMINING THAT MOTHER'S SONS SHOULD REMAIN IN THE CUSTODY OF THEIR FATHER, WHEN THE EVIDENCE WHICH WAS ESTABLISHED AT THE CUSTODY TRIAL CLEARLY REFLECTED THAT MOTHER IS MORE AVAILABLE TO TEND TO THE CHILDREN'S NEEDS, FATHER IS NOT AVAILABLE TO TEND TO THOSE NEEDS, WHICH HE HAD DELEGATED TO STEPMOTHER, AND MOTHER IS MORE EQUIPPED TO ACT AS THE PRIMARY CARETAKER.

THE LOWER COURT ERRED AND ABUSED ITS DISCRETION IN DETERMINING THAT THE PARTY'S SONS AND DAUGHTERS SHOULD BE SEPARATED, SINCE THERE WERE NO COMPELLING REASONS OF RECORD WHICH WOULD ESTABLISH THAT THE CHILDREN SHOULD NOT BE RAISED TOGETHER.

THE LOWER COURT ERRED AND ABUSED ITS DISCRETION IN DIRECTING THAT FATHER CONTINUE TO HAVE PRIMARY PHYSICAL CUSTODY OF HIS SONS, SINCE THE RECORD IN THE INSTANT MATTER CLEARLY ESTABLISHED THAT NOT ONLY IS HE UNAVAILABLE, BUT HE IS NOT ABLE TO COMMUNICATE WITH ANY OF HIS CHILDREN, INCLUDING HIS SONS, STEPMOTHER HAS BEEN CONSTANTLY ABUSING ALL OF THE CHILDREN, FATHER HAS BEEN INTERFERING IN MOTHER'S RELATIONSHIP WITH THE CHILDREN BY NOT EVEN ENABLING THE MOTHER TO COMMUNICATE WITH THE CHILDREN BY TELEPHONE, IT IS MOTHER WHO HAS BEEN ATTEMPTING TO FOSTER A RELATIONSHIP BETWEEN FATHER AND THE CHILDREN, FATHER HAS DONE NOTHING TO RE-

PAIR HIS RELATIONSHIP WITH HIS DAUGHTERS, AND FATHER IS NOT CAPABLE OF TENDING TO THE CHILDREN'S EMOTIONAL NEEDS.

THE LOWER COURT ERRED AND ABUSED ITS DISCRETION IN REFUSING TO GRANT MOTHER PRIMARY PHYSICAL CUSTODY OF HER SONS DURING THE SCHOOL YEAR, IN THE FACE OF THE BOYS INDICATING THAT THEY PREFERRED TO LIVE WITH MOTHER RATHER THAN FATHER.

Brief of Appellant at i-ii.

¶ 4 Inspection of the substance of mother's brief reveals significant repetition among the arguments developed under each of these argument headings. Because of this repetition, mother's arguments can be analyzed under two pervasive argument themes she employs: (a) the trial court erred by improperly ignoring the recommendation of the experts involved in the case; and (b) the trial court's decision to separate the children was error.

### a.

¶ 5 Near the beginning of the argument section of her brief, mother spins the law of deference due from a child custody court to an expert's evaluation. According to mother: "It is an abuse of discretion for the hearing judge to accept as unpersuasive and to totally discount uncontradicted expert testimony. If a trial judge disregards uncontradicted expert testimony, without any explanation as to why he is doing so, this evidences an abuse of discretion." Brief of Appellant at 35 (citations omitted). Moreover, according to mother, "[i]n resolving a custody dispute, [the Superior Court] has stated that it is important that the evidence is developed by disinterested testimony." *Id.* at 36 (citing,

inter alia, *Hall v. Luick*, 314 Pa.Super. 460, 461 A.2d 248 (1983)).

¶ 6 Mother makes slightly too much of the role of the expert in child custody disputes. It may be true that, when expert evaluation is uncontradicted or unqualified, a child custody court abuses its fact finding discretion if it totally discounts expert evaluation. *See generally Straub v. Tyahla*, 274 Pa.Super. 411, 418 A.2d 472 (1980); *Murphey v. Hatala*, 350 Pa.Super. 433, 504 A.2d 917 (1986). To say that a court cannot discount uncontradicted evidence, however, is merely to rephrase the requirement that a child custody court's conclusion have "competent evidence to support it." *Reefer*, 791 A.2d at 374 (quoting *Kaneski*, 604 A.2d at 1077). So long as the trial court's conclusions are founded in the record, the lower court was not obligated to accept the conclusions of the experts. *Murphey*, 504 A.2d at 922. ("[T]he trier of fact is not bound by the testimony of any expert witness and is under no obligation to accept the conclusions of an expert witness.").

¶ 7 Emphasizing the expert evaluations contributed below, mother argues that,

[a]lthough Judge Stine made reference to Dr. Thomas' report and recommendation in his decision in the instant matter, he rejected Dr. Thomas' recommendation that the children should not be separated, and that Mother should have primary physical custody of her sons during the school year, and that Father should have the children over the summer months. However, Judge Stine did not explain why he rejected Dr. Thomas' recommendation.

Brief of Appellant at 36. And,

Judge Stine, "picked and chose" from Dr. Thomas' report and Mrs. Schnerring's testimony, and he ignored Dr. Thomas' recommendation. However,

since Judge Stine gave absolutely no reason why he was rejecting the recommendation, and Dr. Thomas' recommendation was made after a thorough, detailed review of all the facts, through interviews and testing, Mother respectfully submits that Judge Stine erred in rejecting the recommendation of the custody evaluator.

*Id.* at 38.

¶ 8 The experts in this case did contribute valuable analysis of the relevant interpersonal considerations. For example, as mother points out, the experts analyzed: (1) the different strengths and weaknesses of mother's nurturing approach, and father's structured approach, to parenting, *see* Brief of Appellant at 37, 40, 43; (2) the effect that father's heavy work schedule, and the resulting prominence of the children's stepmother in a parenting role, have had on the children, *see Id.* at 37, 38, 42, 43; and (3) the effect of separation on the children, *see Id.* at 41.

¶ 9 We find, however, that the lower court did not abuse its discretion in its handling of the expert advice offered at trial. The trial court's opinion reveals that the court did consider the valuable analysis of the experts, among other relevant considerations, in the crafting of its order. For example, the court noted Dr. Thomas' characterization of father's parenting style:

Dr. Thomas in both his testimony and his report recognized the rigidity of [Father], his inability to communicate in any meaningful way with his ex-wife and the resulting strain that has [been] placed upon the entire family unit. In addition, Dr. Thomas recognized that [Mother] had manipulative characteristics, and in fact commented that ... both she and her current husband, Charles Cook, presented deceptive profiles through the custody evaluation process.

Trial Court Opinion, 6/19/02, at 8–9. Also, the court noted Dr. Thomas' thoughts on father's new wife, stepmother Sue Nomland.

Dr. Thomas further testified that the relationship between Sarah and Jessica Nomland [and Father] had deteriorated to the point where some form of intervention was necessary, and that under the present scenario a working partial custody schedule was virtually impossible. In large part the estrangement between Sarah and Jessica Nomland [and Father] followed [Father's] involvement with his current wife, Sue Nomland, and an ongoing deterioration in the relationship between Jessica and Sarah and their Father, as a result of the presence of Sue Nomland. Dr. Thomas concluded, and this [trial court] agrees after hearing all of the testimony, that primary physical custody of the two teenage daughters of the parties is best placed with ... Mother, especially in light of the extreme hostility between the girls and Sue Nomland.

Trial Court Opinion, 6/19/02, at 9. These sections of the lower court's analysis evidence consideration of the expert analysis contributed below. Moreover, the lower court's factual findings, when based on factual analysis independent of the experts' analysis, support its conclusions.

b.

¶ 10 The second of mother's pervasive themes is that the trial court's decision to separate the children was error. Mother correctly argues that "[o]rdinarily, courts strive to keep siblings together. Absent compelling reasons to the contrary, siblings should be raised together, and this is true of biological siblings as well as half siblings." Brief of Appellant at 41.

¶ 11 It is important, however, to keep the policy of keeping siblings togeth-

er in perspective by remembering that it is only one of the specific factors incorporated in the more general paramount concern: the best interests of the children. As this Court has explained:

Although the general rule is that siblings should not be separated without compelling reasons, this policy is but one factor to be considered, together with others, in determining the best interest of the child. *See, e.g., Haag v. Haag,* 336 Pa.Super. 491, 485 A.2d 1189, 1193 (1984) ("[T]his rule must yield to the paramount principle that the best interests of each individual child must be the determining factor in custody decisions."); *M.D. v. B.D.,* 336 Pa.Super. 298, 485 A.2d 813, 816–17 (1984). ("[T]his policy is but one factor to be considered, together with others, in determining the manner in which the child's best interests will be served.") *McAnallen v. McAnallen,* 300 Pa.Super. 406, 446 A.2d 918, 923 (1982) ("[T]he best interests of the children in the instant case must prevail over any abstract policy.")

*Mahoney v. Mahoney,* 354 Pa.Super. 585, 512 A.2d 694, 697 (1986) (bracketed language in original) (form of citation altered).

¶ 12 The lower court's custody order does separate the children. It provides that "[p]rimary custody of Jonathan and Justin Nomland shall remain with ... Father, Lloyd Nomland. Primary physical custody of the children, Sarah and Jessica Nomland, shall be with ... Mother, Dawn Nomland." Order, 4/9/02, at 1.

¶ 13 Mother argues that separating the children was wrong because the children love each other and miss each other when separated. Also, mother again stresses father's long work hours and her greater parenting strength with respect to nurturing. According to mother, "it was error

for the Judge to separate the children, ... [the boys] should be reunited with their sisters, by this Court directing that [Mother] have primary physical custody of all of her children." Brief of Appellant at 41.

¶ 14 We are not persuaded that the trial court's separation of the children under the custody order was unreasonable in light of the court's factual findings. As the court explained:

The testimony presented at the custody trial reflected that the boys were in a much different position than the girls, that they have adapted well in their current setting, and that although they severely missed their sisters, they appear to be flourishing well in their Father's home. The testimony of the two minor boys likewise supported this conclusion. As related by Dr. Thomas, and as contained in his report admitted into the record, both boys are doing well in their school setting, are involved in extracurricular activities, and have common interests with their Father. They indicated to Dr. Thomas that they played various games and hunted and fished with their Father, that they had "pretty good" relationships with their Father, and when queried as to any problems within the Father's home Jonathan responded "not really." The most serious apparent concern from Jonathan was some inability to appropriately communicate with his Father. During the course of the in camera interviews with Justin and Jonathan the [trial] Court became convinced that they were adapting as well as could be expected in their Father's home, and quite frankly we viewed there to be a risk involved with a transfer of custody during the school year. Both boys were delightful in the interview, positive in many matters, and while they expressed sorely missing their sisters, we can only recognize that

in large part some of the loss was brought about by [Mother] not doing more to promote partial custody within . . . Father's home. Although there are some minor disputes between the Nomland boys and the children of Sue Nomland, nothing was expressed to the [trial court] that was out of the ordinary and out of line with . . . sibling type relationships. The boys are doing well in school, have established friends within their community, are involved in school and extracurricular activities, and a change of primary custody at this point seems unnecessary.

Trial Court Opinion, 6/19/02, at 10–11.

¶ 15 Our review leads us to conclude that the trial court's findings support its order. AFFIRMED.