J-A05014-20

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| | | |
|---|---|---|
| K.B. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| J.J.W., JR. | : | No. 1340 WDA 2019 |

Appeal from the Order Entered August 2, 2019
In the Court of Common Pleas of Allegheny County Family Court at
No(s):  FD16-7135-002

BEFORE:   BENDER, P.J.E., BOWES, J., and PELLEGRINI, J.[*]

MEMORANDUM BY BENDER, P.J.E.:                    FILED MAY 13, 2020

K.B. ("Mother") appeals from the August 2, 2019 order, which awarded

J.J.W., Jr. ("Father") primary physical and sole legal custody of Ad.B.-W. (born

in June of 2013) and K.B.-W. (born in June of 2013) (the "Twins"), and

awarded Mother supervised custody in accordance with a schedule delineated

in the order.  The order also denied Father's petition for relocation and dictated

that Mother is solely responsible for any supervision fees.  After careful review,

we affirm.

In conjunction with its August 2, 2019 order, the trial court issued

findings of fact ("Findings"), in which it summarized the factual background

and procedural history of this case as follows:

_____

[*] Retired Senior Judge assigned to the Superior Court.

The parties are the divorced parents of three minor children: [Ai.B.-W. (born in July of 2008) and the Twins[1]].... Mother is a Pittsburgh native[,] and Father was raised in Haddonfield, New Jersey. The parties were residing in California at the time of their marriage in 2006, and all three children were born in that state. The parties separated in May [of] 2014, and shortly thereafter[,] became enmeshed in extensive custody litigation.

Ultimately, pursuant to a June 22, 2015 California [c]onciliated [c]ourt [a]greement and [s]tipulated [o]rder ("C[A] Order"), the parties agreed that the children could relocate to Pittsburgh with Mother. That order also provided that if Father moved to Pittsburgh[,] he would exercise equally shared custody of the children[,] following a step-up schedule. Mother moved to Pittsburgh in August of 2015, Father followed in November of 2015, and custody proceedings commenced in this [c]ourt soon thereafter.

Currently, Mother has sole physical and legal custody of [Ai.B.-W.], and he is not the subject of either the [r]elocation [p]etition or the [c]ustody [p]etition. Rather, the Twins are at issue in both petitions, the former being Father's request to relocate with them to the [s]tate of New Jersey, with Mother being granted supervised custody, and the latter constituting Mother's request to remain within the jurisdiction of this [c]ourt, with Father exercising supervised custody.

To adjudicate the parties' petitions, the [c]ourt held 10 days of trial and heard from a multitude of witnesses.

Findings, 8/2/19, at 1-2.

On August 2, 2019, the court denied Father's relocation petition and granted Father primary physical and sole legal custody of the Twins, with supervised custody of the Twins granted to Mother on Wednesday evenings and every other weekend. The order also requires Mother to bear the cost of any supervision fees. On August 30, 2019, Mother filed a timely appeal, along

_____

[1] Ai.B.-W. and the Twins are referred to collectively herein as "the children."

- 2 -

with a Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal.

Mother now presents the following issues for our review:

I.  Whether the [t]rial [c]ourt committed an abuse of discretion and error of law by finding that there were no credible allegations of abuse[, where s]uch a finding [was] against the weight of the evidence produced at trial[,] and by granting Mother only supervised visits, granting the siblings only supervised visits[,] and taxing the costs of the supervised visits solely to Mother[?]

II.  Whether the [t]rial [c]ourt committed an abuse of discretion in finding that it … was in the [Twins'] best interest for Father to be awarded sole legal and sole physical custody when the evidence at trial and the court's own analysis of the custody factors under 23 Pa.C.S. § 5328 [did] not support such a finding[?]

III.  Whether the [t]rial [c]ourt committed an abuse of discretion and an error of law, and found against the weight of the evidence [adduced] at trial … that A[i].B.-W. was negatively influencing or coaching the [Twins] and separating the siblings was in the [Twins'] best interest[?]

IV.  [Whether i]t was an error of law for the [t]rial [c]ourt to penalize or take a negative inference against Mother for discussing the case with others in her family, law enforcement, state agencies[,] and advocacy groups[?]

Mother's Brief at 5.

The relevant scope and standard of review are as follows:

[T]he appellate court is not bound by the deductions or inferences made by the trial court from its findings of fact, nor must the reviewing court accept a finding that has no competent evidence to support it.…  However, this broad scope of review does not vest in the reviewing court the duty or the privilege of making its own independent determination.…  Thus, an appellate court is empowered to determine whether the trial court's incontrovertible factual findings support its factual conclusions, but it may not interfere with those conclusions unless they are unreasonable in view of the trial court's factual findings; and thus, represent a gross abuse of discretion.

A.V. v. S.T., 87 A.3d 818, 820 (Pa. Super. 2014) (quoting R.M.G., Jr. v. F.M.G., 986 A.2d 1234, 1237 (Pa. Super. 2009)). Moreover,

> on issues of credibility and weight of the evidence, we defer to the findings of the trial [court] who has had the opportunity to observe the proceedings and demeanor of the witnesses.

> The parties cannot dictate the amount of weight the trial court places on evidence. Rather, the paramount concern of the trial court is the best interest of the child. Appellate interference is unwarranted if the trial court's consideration of the best interest of the child was careful and thorough, and we are unable to find any abuse of discretion.

Id. (quoting R.M.G., Jr., 986 A.2d at 1237 (internal citations omitted)).

When making a decision that involves custody, the trial court must consider the following sixteen custody factors set forth in Section 5328 of the Child Custody Act (23 Pa.C.S. §§ 5321-5340):

> (a) Factors.—In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving weighted consideration to those factors which affect the safety of the child, including the following:

>> (1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.

>> (2) The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.

>> (2.1) The information set forth in section 5329.1(a) (relating to consideration of child abuse and involvement with protective services).

>> (3) The parental duties performed by each party on behalf of the child.

>> (4) The need for stability and continuity in the child's education, family life and community life.

(5) The availability of extended family.

(6) The child's sibling relationships.

(7) The well-reasoned preference of the child, based on the child's maturity and judgment.

(8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional developmental, educational and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

23 Pa.C.S. § 5328(a). See A.M.S. v. M.R.C., 70 A.3d 830, 836 (Pa. Super. 2013). The trial court "shall delineate the reasons for its decision on the record in open court or in a written opinion or order." 23 Pa.C.S. § 5323(d). See also A.V., 87 A.3d at 823 (noting that Section 5323(d) applies to cases involving custody and relocation). "In expressing the reasons for its decision,

there is no required amount of detail for the trial court's explanation; all that is required is that the enumerated factors are considered and that the custody decision is based on those considerations." Id. (internal citation omitted). "A court's explanation of reasons for its decision, which adequately addresses the relevant factors, complies with [s]ection 5323(d)." Id.[2]

Herein, the trial court issued Findings consisting, in part, of a thorough, twenty-page analysis of the foregoing custody factors, in support of its decision to grant Father primary physical and sole legal custody of the Twins. Of the sixteen factors, the trial court determined that ten of the factors were either neutral or not applicable, i.e., (a)(3)-(5), (7), (9)-(12), (14), and (15), and that six factors favored Father, i.e., (a)(1), (2), (6), (8), (13), and (16). The trial court did not find any of the factors to favor Mother over Father. Based on our review, the evidence of record supports the trial court's decision to grant Father primary physical custody and sole legal custody.

Mother argues, however, that the trial court erred and abused its discretion in finding that there were no credible allegations of abuse against Father. Mother's Brief at 10. In fact, she insists that the "most significant issue in this case [is the] ongoing allegations by all three children of sexual maltreatment by Father[,]" and argues that the trial court erred in finding

_____

[2] We acknowledge that Section 5337(h) of the Child Custody Act prescribes the factors which a court must consider when determining whether to grant a proposed relocation. We do not deem it necessary, however, to list the factors herein, as Mother does not contest the trial court's findings regarding Father's petition for relocation.

these allegations incredible based on its credibility determination of numerous expert witnesses. Id. at 12. After careful consideration, we deem Mother's claim to be meritless.

The trial court provided the following detailed explanation of its finding in favor of Father as to its analysis under section 5328(a)(2.1), relating to consideration of child abuse and involvement of protective services:

> The [c]ourt does not find the evidence that Father abused the children credible or persuasive. Almost every alleged disclosure has been made by [Ai.B.-W.], or made by the [Twins] or Mother. The disclosures started with digital vaginal penetration by Father of K.B.-W. and escalated to Father's rape of all three children. The allegations also expanded to include third parties: Father was alleged to have orchestrated and filmed the [T]wins and a neighbor boy, Danny, engaging in deviate sexual acts; paternal grandmother [("PGM")] was accused of sexual and physical abuse; paternal grandfather [("PGF")] was accused of physical abuse.
>
> Mother testified that the children have disclosed, among other things, the following:
>
> 1. [Ai.B.-W.]: [T]hat Father began sexually abusing him at the age of three; that the abuse continued until visitation was stopped in 2018; that [Ai.B.-W.] witnessed Father digitally penetrating the Twins' vaginas and anuses in CA, NJ, and PA; that the Twins told [Ai.B.-W.] of this abuse; that PGM has hit him repeatedly, and physically abused him; that PGM has threatened to harm him and his sisters if he reported the physical abuse.
>
> 2. [K.B.-W.]: [F]irst disclosed in September of 2016 that Father put his fingers in her vagina; that Father has digitally penetrated her vagina and anus; that Father penetrated her anus with his penis; that Father put a toy in her vagina; that Father put his penis in her mouth; that the abuse is ongoing and presently continuing; that PGM touches her vagina and pinches her nipples; that PGF has hit her; that Father punched her in the stomach and hits her; that Father forces the [T]wins to bath[e] with a

- 7 -

neighbor boy named Danny, and that the children are forced to touch each other's private parts and kiss each other while Father films them.

3. [Ad.B.-W.]: [F]irst disclosed in October [of] 2016 that Father put his fingers in her vagina; that Father has digitally penetrated her vagina and anus; that Father penetrated her anus with his penis; that the abuse is ongoing and presently continuing; that PGM touches her vagina and pinches her nipples; that Father forces the [T]wins to bath[e] with a neighbor boy named Danny, and that the children are forced to touch each other's private parts and kiss each other while Father films them.

The above allegations have resulted in over 100 unfounded [ChildLine reports,[3]] spanning three states. [Ai.B.-W.] and [K.B.-W.] have had three forensic examinations, and [Ad.B.-W.] has had two. All three children have been interviewed extensively, by forensic examiners, [Children Youth and Families (CYF)] case workers, doctors, and Mother. [The Twins] did make disclosures at the 2/7/18 forensic interview, but Jennifer Ginsburg, Children's Hospital Child Advocacy Center [f]orensic [i]nterviewer, testified that no details were provided, and the responses to all follow-up questions were "I don't know" or "I don't remember[,"] which she opined was very atypical.

The children have had multiple physical examinations, but the precise number is unclear. (CYF caseworker[,] Cathleen Ruble[,] testified that she was aware of 3-4 physical exams of one or both girls, including an ultrasound; Dr. Wolford testified that each girl had at least one physical exam, and [K.B.-W.] had an evidence or rape kit exam). No evidence of abuse was found.

Criminal investigations have been initiated in Pennsylvania and California. Mother flew the children to CA in October of 2016, and [Ai.B.-W.] had a forensic examination in that state. Detective Orchowski, a 17-year veteran with the Allegheny County Police Department, with 13 years in the child abuse and sex assault unit, testified that she was the investigating officer on the subject case. She noted that Father cooperated with the investigation and took

_____

[3] ChildLine, a unit within the Department of Public Welfare, operates a statewide system for receiving indicated and actual reports of child abuse; refers the reports for investigation; and maintains the reports for reference. 55 Pa.C.S. § 3490.4 (definition of "ChildLine").

a polygraph. She testified that following her investigation, she did not recommend that charges be filed against Father. She further testified that she had never been involved in a case with over 100 [C]hild[L]ines. Moreover, she stated that it was highly unusual and odd for the allegations of abuse to change as they did in the present case, and for the perpetrators of the abuse to change as they did in the present case. The detective also testified that she, her partner, and the assistant district attorney met with the Allegheny County District Attorney, to review the facts of the case. She testified that in her 17 years on the job[,] she had never before been summoned by the district attorney to review a case. She testified that the review was prompted by complaints received regarding the investigation, and that the district attorney agreed that no charges should be filed against Father.

Detective Orchowski also reviewed [a] video of Mother interviewing [Ad.B.-W.] [4] The detective noted that Mother was asking the child leading questions and that [Ai.B.-W.] was coaching her. Detective Orchowski was the investigating officer in the [C]hild[L]ine filed against Mother. She testified that she recommended that charges be filed against Mother, and that in her opinion, Mother is abusing the children by subjecting them to repeated forensic and physical examinations.

Dr. Wettstein, an expert in forensic psychiatry and sexual deviance, conducted a psychiatric evaluation of Father, which included an Abel assessment, and opined that there was no indication that he suffers from a sexual disorder, including pedophilic disorder. The doctor explained that if Father had engaged in any of the [C]hild[L]ined acts, he would have a pedophilic disorder, as that term includes arousal, interest, and behavior. The doctor also testified that it is unlikely that an individual with pedophilic disorder would sexually abuse both female and male children.

[Sharon Profeta, the guardian ad litem ("GAL")] testified that after her extensive investigation, including [the review of] records ... and multiple interviews, she could not find one reason

_____

[4] A video recorded by Mother was played at the custody hearing on July 10, 2019, transcribed by the court reporter, and marked as "Joint Exhibit 1" (hereinafter referred to as "the video"). See N.T. Custody, 7/10/19, 162-165.

to be concerned for the children's safety while in Father's care.[5] She reported that she found no credible evidence that Father has sexually abused any of the children. She further opined that it was difficult to know "where [Ai.B.-W.] ended and [Mother] began." She believes that [Ai.B.-W.] is an advocate for Mother, as evidenced by his request for an emergency meeting at his school, where he produced his notebook and began enumerating his concerns regarding Father's vacation with the [Twins]. The GAL testified that he articulated precise, concrete, calculated concerns, without any spontaneity, and she described the meeting as unnaturally "businesslike." As Ms. Ginsberg noted with the [T]wins, the GAL commented that [Ai.B.-W.] repeats the same sexual allegations, using the exact same words, as if by rote, and is unable to provide any details, which she found very unusual.

This [c]ourt also viewed Mother's video of [Ad.B.-W.] The child did not appear to be sobbing in pain, as Mother alleged, but rather wailing without tears. [Ai.B.-W.] was blatantly coaching the child, and in fact, spoke for her. Finally, Mother was extraordinarily calm and business-like in her interrogation of [Ad.B.-W.] Her speech sounded contrived and affected.

Findings at 8-12 (emphasis added).

Moreover, as the trial court noted in its Pa.R.A.P. 1925(a) opinion,

[its] responsibility is to make credibility determinations and weigh the evidence, among other things. See A.D.[ v. M.A.B.], 989 A.2d [32,] at 35-36[ (Pa. Super. 2010)]. The [c]ourt did so after hearing and observing each witness testify and considering all of the evidence. Ultimately, the [c]ourt found the allegations of

_____

[5] When asked about her observations regarding the sexual abuse allegations against Father, the GAL replied:

I looked as closely as I could. This is a very serious matter. And these children's lives are at stake. I tried as hard as I could to find any information ... I possibly could. And I was not convinced at all that Father did anything to hurt the children.

N.T. Custody, 2/19/19, at 39.

abuse to be incredible. Such a finding is supported by the record, and, indeed, even Mother's counsel noted:

> I would like to say that at the end of the day this [case] is not about proving whether or not [F]ather abused his children. This is a custody case and a relocation case. There are three people that know if [the abuse] occurred [-] the [Twins] and [Father]. And to date, there has been no independent evidence to conclusively prove whether or not abuse has occurred other than the children's statements. We recognize that.

> Simply put, the allegations that Father sexually abused the parties' children were not believable. It is this [c]ourt's responsibility and prerogative to make that assessment, and this [c]ourt did.

Trial Court Opinion ("TCO"), 9/30/19, at 4 (citations to record omitted; emphasis and brackets added by trial court). We deem the trial court's determination to be reasonable in light of its Findings, which are supported by the record. Thus, we discern no abuse of discretion or error of law by the trial court.

Next, Mother claims that the trial court erred in finding that it was in the Twins' best interest for Father to be awarded primary physical and sole legal custody. She argues that there was no clear and convincing evidence to support this custody determination. Mother's Brief at 17. In support of her argument, Mother asserts that the trial court ignored the testimony of Dr. Eric Bernstein. Id. at 18.[6] Dr. Bernstein recommended that Mother maintain primary physical custody of the Twins and that Father be granted partial

_____

[6] Dr. Bernstein testified as an expert witness at the custody hearing on behalf of Mother. See N.T. Custody, 5/2/19, at 8-9. He was tasked with evaluating the Twins' best interest regarding custody and relocation. Id. at 9.

custody, with a neutral party periodically checking in during Father's custodial time to assess that the Twins are comfortable. N.T. Custody, 5/2/19, at 76-77. He explained that check-ins by a neutral party were to serve as an extra layer of protection for Father from any further abuse allegations, as much as they were to protect the Twins. Id. Dr. Bernstein also made it clear that in his court-ordered evaluation, he made no determination as to the truth or falsity of the abuse allegations against Father. N.T. Custody, 5/16/19, at 5.

Contrary to Mother's assertion, it is clear that the trial court did not "ignore" Dr. Bernstein's testimony in reaching its custody decision. Numerous aspects of Dr. Bernstein's testimony were cited by the trial court multiple times within its analysis of the Section 5328(a) custodial factors. See Findings at 12-13, 17, 21. The court also took into consideration, however, the testimony of other expert witnesses. See id. at 9-12, 16-17, 19-21. With respect to the amount of weight a court is to place upon expert testimony in custody matters, this Court has stated the following:

> [W]hen [an] expert evaluation is uncontradicted or unqualified, a child custody court abuses its fact finding discretion if it totally discounts expert evaluation. To say a court cannot discount uncontradicted evidence, however, is merely to rephrase the requirement that a child custody court's conclusion have "competent evidence to support it." So long as the trial court's conclusions are founded in the record, the lower court [is] not obligated to accept the conclusions of the experts.

Nomland v. Nomland, 813 A.2d 850, 854 (Pa. Super. 2002) (emphasis added). As we have already determined that the trial court's conclusions

regarding custody are supported by the record, the court was not obligated to accept Dr. Bernstein's recommendation regarding custody.

To the extent that Mother suggests the trial court's decision to grant her supervised visitation of the Twins is "troubling" and "defies logic[,]" as she currently has sole physical and legal custody of Ai.B.-W., and is considered "an acceptable parent for [him]," Mother's Brief at 19, we note that Ai.B.-W. is not subject to this custody dispute. Mother has sole custody of Ai.B.-W., because Father decided to cease his efforts to repair his relationship with him in 2017, as Father believed those efforts were too detrimental to his son. See TCO at 5; Findings at 2, 6. The custody decision outlined in the August 2, 2019 order pertains to the Twins only, and is fully supported by the record.

Mother further avers that even if the record supported the granting of supervised custody to her, "requiring visits ... be at her sole expense places an impermissible limitation on [her] custodial periods." Mother's Brief at 19. Mother claims that she currently spends in excess of $3,000 per month to see the Twins. Id. It is within the trial court's discretion to impose the cost of supervision on Mother. We discern no abuse of discretion. Thus, Mother is not entitled to relief on this claim.[7]

Additionally, Mother asserts that Dr. Bernstein "did not support separating the siblings[,]" and argues that the trial court ignored his testimony

_____

[7] We uphold the trial court's decision that Mother shall bear the costs pertaining to her periods of supervised custody, without prejudice to Mother's right to seek modification of the custody order with the trial court in the future.

regarding the same. Mother's Brief at 18. Again, we note that the trial court is not obligated to accept the conclusion of an expert witness, so long as its determinations are supported by competent evidence in the record. See Nomland, supra. In its analysis under Section 5328(a)(6), regarding the Twins' sibling relationships, the trial court acknowledged that the Twins are bonded with their brother, Ai.B.-W., and that they have a close and loving relationship with him. See Findings at 13 (relying on Dr. Bernstein's testimony). While the trial court recognized the importance of promoting and protecting sibling bonds, it further stated that it was "concerned with [Ai.B.-W.'s] influence over the [Twins.] [Ai.B.-W.] clearly coached [Ad.B.-W.] on the video Mother made, and [the court] is concerned that [Ai.B.-W.] will attempt to influence [their] opinions of Father." Id. We deem the court's concern to be duly supported by the record and, thus, we discern no abuse of discretion.[8]

As to Mother's assertion that the trial court failed to address the impact of removing the Twins from Mother's custody, and separating them from their brother, school, friends and extended family on Mother's side, we deem her claim to be meritless. In its analysis under Section 5328(a)(4) regarding the need for stability and continuity in the child's education, family life and

_____

[8] See N.T. Custody, 2/25/19, at 27 (where Detective Orchowski testified that it was clear to her that Ai.B.-W. was coaching K.B.-W. in the video); N.T. Custody, 7/1/19, at 32 (where Dr. Wolford recalled viewing the video and testified that she believed Ai.B.-W. was suggesting answers to K.B.-W. in response to Mother's questions).

community life, the trial court recognized that the Twins have completed kindergarten and have lived primarily with Mother from the parties' separation until the shared custody schedule commenced in Pittsburgh. See Findings at 12. The trial court noted Dr. Bernstein's testimony that "Mother serves as the [Twins'] primary attachment, and Father their secondary attachment." Id. at 13. The court added, however, that Dr. Bernstein also opined that "a child's primary attachment does not equate to a superior or more important attachment." Id.[9]

Additionally, with respect to Section 5328(a)(5), regarding the availability of extended family, the trial court found that the Twins are bonded

_____

[9] Dr. Bernstein further explained the distinction between a primary verses secondary bond as follows:

> It's really within the perspective of attachment theory.... So[,] the primary vs. secondary bond is going to signify the immediate connection … between the parent who assumes the majority of responsibility and time spent with the child, who is most attentive to and responsible for their needs, consistent in responsivity and also overall care.

> It doesn't necessarily equate to a healthy bond. It just signifies that it is the first and most significant connection with another human being at the time of the immediate birth and early development. Somebody with a secondary bond or tertiary bond can have a significant role in a child's life. It's not … mutually exclusive.

N.T. Custody, 5/2/19, at 74-75. Dr. Bernstein further acknowledged that a secondary bond can be more important or healthier than a primary bond, especially where the primary attachment is with a person with an unhealthy influence over the child and the secondary person is "more stable and consistent in their role[,] albeit limited in so far as frequency of interaction is concerned." Id. at 81.

with Mother's extended family in the area, but that Father's relatives live in New Jersey and the Twins also see them regularly. Id. Moreover, in its analysis under Section 5328(a)(8), the trial court found:

> Mother and her family members refuse to interact with Father and his family members. This behavior occurs in front of the [Twins]. Mother and her family members will not even acknowledge or return a simple greeting. As would be expected, the [Twins] follow Mother's lead when in her company. Father testified that the [Twins] will not acknowledge his presence or even look at him when Mother is present. While Mother denied this behavior, her testimony was not credible.

> Father testified that he ensures that the [Twins] greet and converse with Mother while in his custody during any activities or events when Mother is present. Mother did not refute this testimony. Father also testified that he has kept a photo of Mother and the three children in the [Twins'] bedroom since his move to Pittsburgh.

Id. at 14. Based on the foregoing, it is clear that the trial court carefully considered the impact of removing the Twins from Mother's custody and separating them from their school and Mother's extended family. We discern no abuse of discretion by the trial court.

Next, Mother claims that the trial court erred in finding that Ai.B.-W. was negatively influencing or coaching the Twins. She insists that "all the testimony at trial" indicated that "the children had a very close and loving relationship[,]" Mother's Brief at 21, and she asserts that the trial court made "absolutely no inquiry or analysis as to the possible harm to the [T]wins or to [Ai.B.-W.]" from the act of separating the siblings. Id. at 22. The record clearly belies Mother's claim.

The trial court provided the following analysis under Section 5328(a)(6),

regarding the Twins' sibling relationships:

> The [T]wins have a brother, [Ai.B.-W.], who resides with Mother and has no contact with Father. The [T]wins are bonded to [Ai.B.-W.] and have a close and loving relationship with him. Mother testified that [Ai.B.-W.] is extremely stressed and anxious when the girls are in Father's custody. She testified that he feels guilty for not disclosing Father's abuse earlier, and feels responsible for the [Twins'] continuing abuse. [Ai.B.-W.] told Dr. Bernstein that the [Twins] need to "keep fighting and be strong."
>
> While it is important to promote and protect sibling bonds, this [c]ourt is concerned with [Ai.B.-W.'s] influence of the [Twins.] [He] clearly coached [Ad.B.-W.] on the video Mother made, and this [c]ourt is concerned that [he] will attempt to influence the [Twins'] opinions of Father.

Findings at 13. Additionally, the court noted:

> Mother testified repeatedly that she believes the children's reports of sexual abuse. However, as Dr. Wettstein testified, people convince themselves that untrue things are true all the time. He opined that Mother may have convinced herself, as well as others, of the validity of the sexual abuse allegations. He further testified that Mother may have unconsciously helped create the abuse allegations. He explained that "...people without awareness act out all sorts of emotions and convictions and feelings and conflicts and beliefs." He explained that anxiety is contagious. A parent's anxiety may be shared with children, and over time may become intensified, amplified, and take on new forms.
>
> Drs. Wettstein, Wolford, and Bernstein all testified that children are susceptible to suggestion and easily manipulated. Dr. Wettstein explained that "even asking a question can create an idea in someone's head that an event has occurred when it hasn't." Coaching can also be non-verbal, such as "showing or demonstrating or revealing one's anxiety about a situation...." Thus, if the children come home from a visit with Father and Mother anxiously checks and examines them, she is, whether consciously or unconsciously, conveying the message that something bad happened to them or that they should be afraid of

- 17 -

Father.  Likewise, repeated forensic and physical examinations can create a belief that abuse has occurred.

[Ai.B.-W.] may be exacerbating this phenomenon.  Dr. Katz testified that [Ai.B.-W.] had an anxious attachment to Mother and mirrored [her] distrust of Father.  Dr. Wettstein acknowledged that the [Twins] may be influenced by [Ai.B.-W.'s] anxiety or by conversations with him.  They may also be indirectly influenced by the fact that he does not have visitation with Father.

Findings at 20-21 (citations to record omitted).

While we agree with Mother that the law favors keeping siblings together, absent a compelling reason to the contrary, this is but one factor to be considered in determining the best interest of the child.  See Nomland, 813 A.2d at 856.  After careful review, it is clear that the trial court carefully weighed Ai.B.-W.'s influence over the Twins verses the impact of separating the siblings.  We deem the court's finding in favor of Father with respect to its analysis regarding the sibling relationships to be supported by the record.

Finally, Mother argues that the trial court penalized her for discussing the custody case with others in her family, law enforcement, state agencies, and advocacy groups.  Mother's Brief at 23.  Mother claims that she had not shared information regarding the case to the general public to vilify Father but, rather, "to obtain assistance in helping her children regarding the allegations of ongoing abuse because she felt the system had failed them." Id. at 24.  Mother states that it is reasonable to conclude, based on the fact that she lost primary custody of the Twins, that the trial court took a negative inference from her words and actions.  She concludes that it was impermissible

for the trial court to find her protected speech as a negative factor against her when analyzing the custody factors. Id. at 25.

To the contrary, the trial court opined:

> The court's order was not punitive in nature. That the order caused a change in Mother's custodial relationship with the Twins may be—and likely is—difficult for her, but it is a reality she must face, not a punishment. The order was required to be and was made in the children's best interest, not according to Mother's desires or preferences.[1]
>
>> [1] The order was also not made in accordance with Father's desires or preferences. If it were, then Father's relocation petition would have been granted.
>
> Moreover, the court took no inappropriate negative inference against Mother for distributing information about these proceedings. Instead, the court—as set forth at length in its Findings, see Findings at 15-16—merely noted the facts of Mother's conduct, that the same has exposed the parties' children to the world in a way that cannot be controlled or reversed, and that said actions were relevant to the court's analysis of the factors set forth in 23 Pa.C.S. § 5328(a).

TCO at 8 (unnecessary capitalization omitted).

The trial court did not seek to deny Mother of her right to free speech. Rather, it is clear from the record that the trial court was concerned with Mother's judgment and the effect that her words and actions may have on the Twins, as reflected in its analysis under Section 5328(a)(9):

> The court believes that both parties have and will maintain loving, stable, consistent, and nurturing relationships with the [Twins.] The court is concerned, however, with Mother's judgment. Mother continues to assert that the [Twins] are being abused, and she has pursued every conceivable avenue available to expose Father, with no regard for the consequences to the [Twins.] The evidence disclosed that there have been more than 100 unfounded [C]hild[L]ine [reports], multiple forensic and physical examinations, and multiple unsuccessful criminal

investigations. Mother testified that a [ChildLine report] was made just one week before her July 2019 trial testimony. Mother testified that she believes that Father's sexual abuse of the [Twins] is ongoing and that she will do anything in her power to stop it. The GAL testified that Mother stated she would fight until her last breath to keep the [Twins] from Father.

Mother has distributed the [protection from abuse (PFA) hearing] transcript and various documents pertaining to the subject case to a wide variety of people. She testified that she couldn't remember the number of people to whom she and her family had distributed that transcript, as she did not have a list. Mother gave Paul Van Osdol and WTAE news[] copies of the PFA transcript, [ChildLine reports], medical records, and the [c]ourt's opinion related to the PFA. She did not redact any of the documents and acknowledged that she had no control over what was aired. She gave a television interview and allowed the Twins to be filmed. While her face and the Twins' faces were blurred, the interior of her home, and the [last] name … on the transcript were not. Mother testified that she has reported the abuse to "so many people" across the U.S. and Pennsylvania, that she couldn't recall them all without a list. She did remember speaking to the attorney general, auditor general, [the] Department of Homeland Security, [S]tate [R]epresentative Costa, the Center for Judicial Excellence, various women's shelters, the Center for Victims, [Pennsylvania] state police, and North Fayette police. Mother was opposed to sealing the court docket when it was open to the general public and contained extensive detailed allegations of sexual abuse committed against all three children, who were named.

Various members of the faculty and staff at the children's elementary school and religious school are aware of the abuse allegations. Mother testified that [Ai.B.-W.] has made disclosures to the principal, assistant superintendent, guidance counselor, and numerous teachers at the school [which] he and the Twins attend. He has also made disclosures to the priest at the family's church. Mother acknowledged that she advised the education director of the children's religious school of the abuse.

Mother is seemingly unaware of the likely ill-effects of her actions on the children. In her crusade to expose Father, Mother has also exposed the children. Countless unredacted records and documents have been disseminated to a wide range of people and organizations. Mother has no control over these documents and

there is no way to predict in what medium they will appear or in whose hands they will land.

Dr. Wolford, a physician at UPMC Children's Hospital, and an expert in pediatrics and child abuse pediatrics, opined that the Twins are the "...victims of abuse by Mother in the form of medical child abuse (Munchasusen by Proxy Syndrome), physical abuse (repeated unnecessary evaluations) and emotional abuse (continued harm and developmental disruption by these repeated allegations of sexual abuse by [Father].)" Dr. Wolford testified to the various future ill-effects of this abuse, including but not limited to, a mistrust of the medical system, the impairment of basic child development, maladaptive coping mechanisms, poor resiliency, increased stress levels, depression and anxiety.

Dr. Bernstein, of Allegheny Forensics Association, also testified to the ill-effects of subjecting the children to continued interviews and examinations, which he described as tragic. Among other things, the doctor testified that the children's idea of familial safety, and their opinion of Father, will become polluted, they may develop difficulties with boundaries, the development of their sexuality and identity could be compromised, and their self-esteem, confidence, and self-assurance may be affected.

Dr. Wolford testified that in her medical assessment[,] the children were being coached by Mother and that they were "parroting" Mother. She testified that children are extremely impressionable, eager to please, and can be convinced something is true by simple repetition. Dr. Bernstein, on the other hand, testified that he did not believe the children were being coached by Mother. However, Dr. Bernstein was unable to view Mother's video interview of [Ad.B.-W.]. He also testified that proof of the existence or non-existence of [the alleged neighbor,] Danny[,] would lend a great deal of credibility to either Mother's or Father's position. Mother attempted to deflect the questions posed regarding whether a private investigator had been hired to locate Danny. She finally admitted that her sister had hired an investigator for this purpose. It appears that the results were negative since no testimony in this regard was offered, Father testified that no such child exists, and that CYF's attempts to locate the child were unsuccessful.

Findings at 14-18 (unnecessary capitalization omitted). We discern no abuse of discretion by the trial court.

For the reasons stated above, we affirm the court's August 2, 2019 order denying Father's petition for relocation and granting primary physical and sole legal custody of the Twins to Father and supervised custody to Mother.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/13/2020